**SHAFER & FREEMAN LAKES ENVIRONMENTAL CONSERVATION CORPORATION, Appellant–Defendant,**

v.

**Justin STICHNOTH and Corraine Stichnoth, Appellees–Plaintiffs.**

No. 91A04–0611–CV–661.

Court of Appeals of Indiana.

Nov. 29, 2007.

Edward F. Harney, Jr., Michael E. Simmons, Mark M. Holdridge, Hume Smith Geddes Green Simmons, LLP, Indianapois, IN, Attorneys for Appellant.

William E. Winingham, Christopher G. Stevenson, Wilson Kehoe & Winingham, Indianapolis, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Shafer & Freeman Lakes Environmental Conservation Corporation ("Shafer") appeals from the trial court's judgment in favor of Justin and Corraine Stichnoth (collectively "the Stichnoths") on their complaint alleging negligence. Shafer presents four issues for our review:

1. Whether the trial court erred when it denied Shafer's summary judgment motion on the issue of whether Justin was a licensee when he dove into Lake Shafer.

2. Whether the trial court abused its discretion when it denied Shafer's motion to bifurcate the trial.

3. Whether the trial court abused its discretion when it permitted expert testimony regarding Justin's impaired earning capacity.

4. Whether the trial court abused its discretion when it denied Shafer's motion to withdraw its nonparty defense.

We affirm.[1]

### FACTS AND PROCEDURAL HISTORY

On July 17, 2004, Justin, who was twenty-six years old at the time, was visiting his parents at their house located on Lake Shafer. During a conversation that day, Justin's father, Kerry, told Justin about a dredge pipe that had been installed in the channel near their dock. Kerry explained that recently he had gotten his boat "hung up" on the dredge pipe. Transcript at 570. Shortly thereafter, Justin took a running dive off of his parents' dock into the channel. Justin had frequently made shallow-water dives off of his parents' dock over the years. But that day, Justin struck his head on the dredge pipe, which was located on the channel floor, approximately seventeen feet from the dock. As a result, Justin sustained fractures to three of his

---

1. We heard oral argument in this case on October 29, 2007, at Indiana University School of Law–Bloomington.

cervical vertebrae and a spinal cord contusion. Justin was initially rendered a paraplegic, but after months of rehabilitation, he was able to breathe on his own, walk, and lift his arms to his face.

On September 22, 2004, the Stichnoths filed a complaint against Shafer alleging that Shafer's negligence caused Justin's personal injuries. In particular, the Stichnoths alleged that Shafer was negligent in failing to warn that there was a pipe beneath the water's surface, in failing to mark the pipe so that it would be visible to users of the lake, and in failing to use reasonable care in dredging the lake. In its answer, Shafer denied the allegations of negligence and asserted affirmative defenses, including naming Justin's parents as nonparties. Thereafter, the Stichnoths amended their complaint to name Commonwealth Engineers as a defendant. Commonwealth Engineers subsequently reached a settlement with the Stichnoths and were dismissed from the case. And Shafer named Commonwealth Engineers as a nonparty.

On August 15, 2006, Shafer filed a Motion for Summary Judgment on the issue of whether Justin was a licensee of Shafer. In addition, Shafer moved to bifurcate the trial on the issues of liability and damages. The trial court denied those motions following a hearing.

On October 6, Shafer filed a Motion to Exclude in Whole or in Part Plaintiffs' Expert Witness, Dr. Edward Berla. The Stichnoths hired Dr. Berla to testify regarding Justin's impaired earning capacity as a result of his injuries. The trial court denied Shafer's motion to exclude Dr. Berla's testimony.

On October 16, the jury trial commenced. On the final day of trial, when the parties were ready to discuss final instructions, Shafer moved to withdraw Kerry Stichnoth and Commonwealth Engineers as nonparties. The Stichnoths objected, and the trial court denied the motion following argument. Accordingly, both nonparties were named on the verdict forms. After deliberations, the jury returned a verdict in favor of the Stichnoths in the amount of $3,398,000. And the jury assessed fault as follows: Justin 50%; Shafer 30%; and Kerry Stichnoth 20%. The trial court entered judgment against Shafer in the amount of $1,019,400. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Summary Judgment

■ Shafer first contends that the trial court erred when it denied its summary judgment motion alleging that Justin was a licensee as a matter of law. When reviewing summary judgment, this court views the same matters and issues that were before the trial court and follows the same process. *Estate of Taylor ex rel. Taylor v. Muncie Med. Investors, L.P.,* 727 N.E.2d 466, 469 (Ind.Ct.App.2000), *trans. denied.* We construe all facts and reasonable inferences to be drawn from those facts in favor of the non-moving party. *Jesse v. Am. Cmty. Mut. Ins. Co.,* 725 N.E.2d 420, 423 (Ind.Ct.App.2000), *trans. denied.* Summary judgment is appropriate when the designated evidence demonstrates that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C).

■ The tort of negligence is comprised of three elements: 1) a duty on the part of the defendant in relation to the plaintiff; 2) a failure by the defendant to conform its conduct to the requisite standard of care; and 3) an injury to the plaintiff proximately caused by the failure. *Estate of Pflanz v. Davis,* 678 N.E.2d 1148, 1151 (Ind.Ct.App.1997). The law is well-

established that a person entering upon the land of another comes upon the land either as an invitee, licensee or trespasser. *Id.* The person's status on the land defines the nature of the duty owed by the landowner to the visitor. *Id.* The question of whether one is an invitee or a licensee is a matter of law. *Jump v. Bank of Versailles,* 586 N.E.2d 873, 875 (Ind.Ct.App. 1992).

Again, in its summary judgment motion, Shafer argued that Justin was a licensee as a matter of law. The Stichnoths argued that Justin was an invitee. Our courts have had several opportunities to discuss the distinction between invitees and licensees. In *McCormick v. State,* 673 N.E.2d 829, 836–37 (Ind.Ct.App.1996), this court observed:

> In Indiana, those persons described in the Restatement (Second) of Torts § 332 qualify as invitees. *Burrell v. Meads,* 569 N.E.2d 637, 642 (Ind.1991). The restatement provides:
>
> > (1) An invitee is either a public invitee or a business visitor.
> >
> > (2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose which the land is held open to the public.
> >
> > (3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.
>
> Restatement (Second) of Torts § 332; *Burrell,* 569 N.E.2d at 642. Licensees have a license to use the land and are privileged to enter or remain on the land by virtue of the permission or sufferance of the owner or occupier. *Id.* at 640 (citing Restatement (Second) of Torts § 330, cmt. c, (possessor's consent)). Licensees enter the land of another for their own convenience, curiosity, or en-

tertainment and take the premises as they find them. *Id.*

A public invitee is a person who is invited to enter or remain on another's land for a purpose for which the land is held open to the public but a licensee is privileged to enter or remain on the land by virtue of *permission* or sufferance. *Frye* [*v. Rumbletown Free Methodist Church*], 657 N.E.2d [745] at 748 [Ind. Ct.App.1995] (referring to Restatement (Second) of Torts §§ 330 and 332) (emphasis added). Thus, *in the determination of whether an individual is a public invitee or a licensee, the distinction between the terms "invitation" and "permission" becomes critical.* The comments to Restatement (Second) of Torts § 330 provide that:

> c. Consent and toleration. The word "consent," or "permission," indicates that the possessor is in fact willing that the other shall enter or remain on the land, or that his conduct is such as to give the other reason to believe that he is willing that he shall enter, if he desires to do so.

The comments to Restatement (Second) of Torts § 332 clarify the distinction between invitation and permission:

> b. Invitation and permission. Although invitation does not in itself establish the status of an invitee, it is essential to it. An invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so.
>
> * * *
>
> Mere permission, as distinguished from invitation, is sufficient to make the visitor a licensee, as stated in

§ 330; but it does not make him an invitee. . . .

The comments to the same section of the Restatement clarify what is meant by land held open to the public for purposes of the public invitee:

> d. *Land held open to the public. Where land is held open to the public, there is an invitation to the public to enter for the purpose for which it is held open. Any member of the public who enters for that purpose is an invitee* . . .
>
> * * *
>
> It is not enough, to hold land open to the public, that the public at large, or any considerable number of persons, are permitted to enter at will upon the land for their own purposes. *As in other instances of invitation, there must be some inducement or encouragement to enter, some conduct indicating that the premises are provided and intended for public entry and use, and that the public will not merely be tolerated, but is expected and desired to come.* When a landowner tacitly permits the boys of the town to play ball on his vacant lot they are licensees only; but if he installs playground equipment and posts a sign saying that the lot is open free to all children, there is then a public invitation, and those who enter in response to it are invitees.

Restatement (Second) of Torts § 332 (emphasis added). *The decisive factor with regard to whether the possessor has extended an "invitation" or "permission" is the interpretation which a reasonable man would put upon the possessor's words and actions given all of the surrounding circumstances.* See Restatement (Second) of Torts § 330, cmt. e; Restatement (Second) of Torts § 332, cmt. c.

(Some emphases added, some original).

Here, Shafer contends that:

> Lake Shafer is not open to the public at large. All individuals entering Lake Shafer waters may do so only after passing over private property with the permission of the private property's landowners. There is no public access except over a private landowner's property. In this case, Justin entered [Shafer-]owned property by virtue of the permission of his parents to cross their land. He would have been a trespasser over the shorefront and upon entering the channel without such permission. Like the Plaintiff in [*Moore v. Greensburg High School*, 773 N.E.2d 367 (Ind. Ct.App.2002) ], Justin neither had an express or implied invitation from [Shafer]. He simply entered the [Shafer] property with permission for his own "convenience, curiosity or entertainment" and as such should be found to be a licensee at the time of his incident.

Brief of Appellant at 14–15.

The Stichnoths counter that Lake Shafer *is* open to the public at large in that there are various points where the public can access the lake without crossing private property.[2] And the Stichnoths direct us to designated evidence showing that the lake is a public lake, including the affidavit of Daryl Johns, Shafer's Executive Director. Further, Shafer's Articles of Incorporation provide in relevant part:

> The Corporation is organized and will be operated to *fulfill certain actions for the benefit of the people of the State of*

---

**2.** During oral argument, counsel for Shafer conceded that the public could access the lake via the Tippecanoe River.

*Indiana* by operating exclusively for charitable, religious, educational and scientific purposes, including promoting environmentally sound use of Lake Shafer and Lake Freeman. The corporation will conduct itself in a way to *protect and enhance the environment and the water quality of these lakes in order to facilitate public recreational use.* The Corporation will accomplish this purpose through various activities, including but not limited to, the issuance and administration of permits for the use of shoreline property, the testing of the water quality, monitoring shoreline quality and *ensuring continued public access.*

Appellant's App. at 110 (emphases added). And the Agreement to Convey Property, by which NIPSCO agreed to transfer title to Lake Shafer and Lake Freeman to Shafer, contains the following provision:

Holding for Public Purpose. [Shafer] agrees that it is taking and will hold the Properties for public charitable recreational, conservation and environmental purposes in accordance with [Shafer's] Amended Articles of Incorporation ("Charter"), By-laws, and the Ruling Letter. [Shafer] specifically acknowledges that continued funding by NIPSCO pursuant to this Agreement shall be contingent on [Shafer] continuing to hold, use and manage the Properties [including Lake Shafer] consistent[ ] with this Agreement.

Appellant's App. at 132. In light of that evidence, the Stichnoths contend that Shafer impliedly invited Justin to use Lake Shafer.

We agree with the Stichnoths that the designated evidence shows that Lake Shafer is a public lake. And we agree that the Articles of Incorporation and Shafer's conduct in maintaining the lake to "facilitate public recreational use" support a determination that Shafer impliedly invited the public to use the lake.[3] We reject Shafer's contention that the public uses the lake only with the permission of adjacent private landowners and not at Shafer's invitation. Many Indiana lakes are surrounded by private property. While most visitors to those lakes may reach the water from private property, that fact alone does not convert a lake otherwise held open for public use into a private lake. Shafer did not satisfy its burden to show that Justin was a licensee as a matter of law. The trial court did not err when it denied Shafer's summary judgment motion.

### Issue Two: Bifurcation

Shafer next contends that it suffered prejudice as a result of the Stichnoths' liability claim being tried with their damages claim. A trial court's decision whether to bifurcate is subject to an abuse of discretion standard. *See Elkhart Comm. Schs. v. Yoder,* 696 N.E.2d 409, 414 (Ind.Ct.App.1998). Indiana Trial Rule 42(B) provides:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party

---

3. Shafer's reliance on *McCormick* to support its contention on this issue is misplaced. In *McCormick,* we held that there was no designated evidence "from which one could reasonably conclude that the Water Company desired, induced, encouraged or expected the decedent to enter the reservoir." 673 N.E.2d at 837. Here, however, the evidence shows that Shafer was created with the purpose of maintaining the lake for recreational use by the public, so Shafer can be reasonably said to have desired, encouraged, and expected Justin to use the lake.

claims, or issues, always preserving inviolate the right of trial by jury.

In *Frito–Lay, Inc. v. Cloud,* 569 N.E.2d 983 (Ind.Ct.App.1991), this court explained the considerations a trial court makes in ruling on the issue of bifurcation:

The avoidance of prejudice is more than sufficient reason for a separate trial. However, a separate trial should not be granted solely upon the movant's speculation that it might be prejudiced by certain testimony. If an issue can be conveniently and expeditiously resolved, a separate trial may be ordered in the interest of judicial economy. If the proof of damages will be complicated and costly the issue of liability could first be separately tried.... However, ... while the separation of trials can result in judicial economy when the defendant prevails on the issue of liability (by obviating the need for a trial on damages), the defendant must first convince the court that it has a persuasive argument on the question of liability in order to justify the potential risk and expense of two trials.

*Id.* at 990 (citations omitted).

Here, Shafer contends that its motion for bifurcation should have been granted on all three grounds enumerated in Trial Rule 42(B), namely, convenience, avoidance of prejudice, and judicial economy. In support of that contention, Shafer directs us to *Frito–Lay.*[4] In that case, we held that the trial court had abused its discretion when it denied Frito–Lay's motion to bifurcate, and we stated, "[w]e cannot imagine a case more appropriate for

bifurcation than the case at bar." *Id.* at 991. But we also noted:

*Had we not been required to reverse this case [on other grounds], we would be extremely reluctant to invade the province of the trial court's discretion on the issue of bifurcation.* However, we must reverse this case on both the issues of liability and damages for errors unrelated to bifurcation. Let us not permit the long, exhausting trial below to have been in vain. The trial below provides us with the benefit of hindsight that was unavailable to the trial court when it faced the initial decision of whether or not to bifurcate this trial. Based on the above analysis and the benefit of this hindsight, we conclude that the denial of a motion for the bifurcation on the issues of liability and damages in the retrial of this case would constitute an abuse of discretion.

*Id.* (emphasis added).

And our Supreme Court recently held that a trial court did not abuse its discretion when it denied a motion to bifurcate issues of liability and a bad faith claim against an insurance company. *See State Farm Mut. Auto. Ins. Co. v. Gutierrez,* 866 N.E.2d 747, 752 (Ind.2007). The court stated, "[w]e think that as a policy matter, it will often be appropriate for bad faith claims to be tried separately from liability claims." *Id.* But because the codefendant-driver had filed his motion to bifurcate "several weeks" after a deadline set by the trial court, "as well as the absence of any significant amount of prejudice,"[5] our Supreme Court was "unwilling to impose a new trial upon the trial court and the

---

4. In that case, which involved a vehicular collision, the plaintiff sustained "nearly fatal" injuries, including partial paralysis and brain damage. *Frito–Lay,* 569 N.E.2d at 985. At trial, a jury found the plaintiff 49% at fault, Frito–Lay 21% at fault, and another defendant 30% at fault.

5. The court held that the codefendant-driver had only shown the "potential for prejudice," not actual prejudice, in support of bifurcation. *Gutierrez,* 866 N.E.2d at 750.

parties simply to establish this new principle." *Id.*

Here, Shafer contends that "[i]t would appear to be all but impossible for a jury to separate entirely its thoughts on damages from the liability determination in any case involving strongly contested liability and serious injuries such that Defendant is not prejudiced in defending the liability side of the case." Brief of Appellant at 32. And Shafer asserts that its case is "very defensible on the issues of liability" in that it exercised reasonable care in dredging Lake Shafer and that Justin knowingly dove into very shallow water. *Id.* at 33. Further, Shafer maintains that the severity of Justin's injuries prejudiced it in the eyes of the jurors. Finally, Shafer contends that bifurcation is convenient and serves the principle of judicial economy since the issues underlying liability and damages are "separate and distinct." Brief of Appellant at 35.

■ The Stichnoths contend that Shafer can only speculate that it was prejudiced by the damages claim being tried with the liability claim. And it is well-settled that mere speculation that one might be prejudiced by certain testimony is insufficient to require a separate trial. *See Gutierrez,* 866 N.E.2d at 750. The Stichnoths point out that "there is no evidence that the jury was overwhelmed with compassion and sympathy for Justin" since the jurors assessed his fault at 50% and awarded damages in an amount on the low end of what Shafer had estimated the Stichnoths' damages to be. Brief of Appellants at 32–33. As such, the Stichnoths maintain that the trial court did not abuse its discretion when it denied Shafer's motion to bifurcate.

Given the trial court's broad discretion on this issue, we cannot say that Shafer has demonstrated reversible error in this case. As the Stichnoths correctly point out, the jury's assessment of 50% fault to Justin is a strong indicator that jurors were not unduly affected by the evidence of his damages. Shafer cannot show more than the potential for prejudice, which is insufficient to justify a new trial on this issue. *See Gutierrez,* 866 N.E.2d at 750. The trial court did not abuse its discretion when it denied Shafer's motion to bifurcate the trial.

### Issue Three: Expert Testimony

■ Shafer next contends that the trial court abused its discretion when it permitted the Stichnoths' expert, Dr. Edward Berla, to testify regarding Justin's impaired earning capacity. In particular, Shafer asserts that "both the methodology used by Dr. Berla lacks scientific validity and his opinions do not fit the particular facts of this case as required by Indiana law." Brief of Appellant at 18. Shafer maintains that Dr. Berla's testimony was unduly prejudicial and that its admission into evidence warrants a new trial.[6] We cannot agree.

■ Indiana Evidence Rule 702 provides that:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that

---

6. The Stichnoths contend that Shafer did not make a contemporaneous objection to Dr. Berla's testimony and that the issue is waived. Because the record is unclear whether Shafer made a continuing objection to preserve the issue, we do not find waiver on appeal.

the scientific principles upon which the expert testimony rests are reliable.

In determining whether scientific evidence is reliable, the trial court must determine whether such evidence appears sufficiently valid or, in other words, trustworthy, to assist the trier of fact. *West v. State*, 805 N.E.2d 909, 913 (Ind.Ct.App.2004), *trans. denied*. In so doing, the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Lytle v. Ford Motor Co.*, 814 N.E.2d 301, 309 (Ind.Ct.App.2004), *trans. denied*. We will reverse the court's determination only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable and actual deductions to be drawn therefrom. *Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 550 (Ind.Ct.App.1999), *trans. denied*.

■■■■ Our supreme court has declared that "there is no specific 'test' or 'set of prongs' which must be considered in order to satisfy Indiana Evidence Rule 702(b)." *West*, 805 N.E.2d at 913 (quoting *McGrew v. State*, 682 N.E.2d 1289, 1292 (Ind.1997)). Indiana courts may consider the five factors set out by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993):(1) whether the theory or technique at issue can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted within the relevant scientific community. While *Daubert* is not binding upon the determination of issues under Indiana Evidence Rule 702, we have acknowledged the utility of applying the five factors. *See Steward v. State*, 652 N.E.2d 490, 498 (Ind.1995); *West*, 805 N.E.2d at 914.

Here, the Stichnoths presented Dr. Berla's testimony to establish Justin's lost earnings and impaired earning capacity as a result of his injuries. Dr. Berla is a vocational economic analyst with years of relevant experience, including employment with the Social Security Administration as a vocational expert and a professorship teaching courses on the vocational and psychological impacts associated with physical disabilities. In calculating the economic impact of Justin's injuries on his life, Dr. Berla interviewed Justin and consulted data sets from the United States Bureau of Labor Statistics ("BLS"), including the "Current Population Survey" and the "American Community Survey." Dr. Berla explained that those data sets help experts to "come up with an estimate of how long a person would work based upon the specific characteristics of the individual." Transcript at 833. In addition, the data sets provide an estimate of the reduction in income disabled persons will experience throughout their lives. To analyze the data sets, Dr. Berla utilizes a computer program created by Dr. Anthony Gamboa, the owner of Vocational Economics, Inc. ("VEI").

Dr. Berla came up with two scenarios. In one scenario, Justin retains his job at Eli Lilly, and in the second scenario, Justin leaves Eli Lilly and takes employment elsewhere. Using the data sets, Dr. Berla opined that Justin will lose between approximately $383,000 and $561,000 in income over his lifetime if he retains his employment with Eli Lilly. That loss in income reflects Justin's diminished capacity to perform his job and the likelihood that he will have to retire sooner than if he

were not disabled. Under the second scenario, Dr. Berla opined that Justin's income loss would be approximately $871,333 to $905,872 over his lifetime.

In moving to exclude Dr. Berla's testimony, Shafer argued that the data upon which the VEI computer program is based is scientifically unreliable. Shafer hired a forensic economist, Dr. Gary Skoog, who testified in an offer to prove that he and several of his peers believed that VEI's use of the BLS data sets constituted "junk science." Transcript at 774. In short, Dr. Skoog opined that the data sets were not designed to be used in forecasting future earning capacity impairment.

In denying Shafer's motion to exclude Dr. Berla's testimony, the trial court stated in part:

> Well, I certainly know a lot more than I did, and I don't know that it's refined my perception of the issue that the Plaintiff wants to produce evidence about to get in front of the jury. I think I have questions about the data, but I, and I haven't actually seen the report itself. I'm still inclined to let the witness testify. I'll tell you why. I don't think this is real science. I think it's something someone can be an expert about. I think most experts who are social science experts gain their credibility and their ability to be an expert from some discipline that they're particularly trained at intellectually and have experience at by writing or studying or doing research or running surveys or something. And I think you can be qualified as an expert if you can demonstrate on the record that you have an ability based upon your experience and your training, your education, to give an opinion that recognizes all sides of the issue and because of what you know and study

and thought about you believe that you're on the correct side of the issue. Transcript at 809–10.

On appeal, Shafer argues that Dr. Berla's testimony does not meet any of the *Daubert* criteria and should have been excluded. But our review of the record shows that the trial court thoughtfully performed its gatekeeping function. As the trial court observed, and as the parties stated during oral argument, Dr. Berla's testimony was a hybrid of specialized knowledge and scientific evidence. The trial court carefully considered the arguments by both parties regarding the scientific bases for the challenged testimony, and we cannot say that the trial court's analysis was incorrect. Further, Shafer was able to thoroughly cross-examine Dr. Berla and present its own evidence that the Gamboa data sets were unreliable for use in this case. Shafer has not demonstrated that the trial court's decision to permit Dr. Berla's testimony was an abuse of discretion.

### Issue Four: Nonparty Defense

Finally, Shafer contends that the trial court abused its discretion when it denied its motion to withdraw its nonparty defense. Just prior to closing arguments at the conclusion of the jury trial, Shafer moved to withdraw its defense, which it asserted in its answer, naming Kerry Stichnoth and Commonwealth as nonparties. The Stichnoths objected, stating:

> This is equivalent to amending a pleading. It's in essence amending an answer. And, at this point the Court has discretion, I believe, in whether to allow that or not. This case has been tried from start to finish with the jury being told that nonparties, Commonwealth and Kerry Stichnoth, are involved in this case as nonparties and the Defendants said that in opening statement and the jury was instructed that they were non-

parties and they [were] being joined in part for the injuries. For that reason, I think it would be unfair to now withdraw that very defense because the whole case has been tried upon that premise. Transcript at 1210–11.

After argument, the trial court stated:

Well, I was surprised, as the Judge, that the nonparty issue or defense is now being withdrawn at the conclusion of the evidence and prior to the final argument. It's clear there was pointed testimony by both, at the request of both sides' counsels, from more than one witness, that the behavior of persons other than the parties in the proximate cause [sic] of the injury complained of. I'm inclined to leave it in. I can't say that I've ever had anybody ask to withdraw [a nonparty defense].... I don't know how a jury would react in terms of wonder.... It sounds simple at first blush when you're a Judge, when somebody wants to withdraw something, you, oh great, something else I don't have to mess with. But it's clearly part of the fabric of this case. And I think it would do more harm than good in the decision[-]making process to withdraw.

Transcript at 1212–14. Accordingly, the trial court denied the motion to withdraw nonparty defense.

On appeal, Shafer cites to *Bauer v. J.B. Hunt Transport, Inc.*, 150 F.3d 759 (7th Cir.1998), where the defendant pleaded an "Act of God" affirmative defense and argued throughout trial that bad weather was responsible for the vehicular collision in which plaintiff was injured. At the end of the jury trial, in discussing jury instructions, the defendant moved to withdraw its Act of God affirmative defense, and the court granted that motion. On appeal, the circuit court observed that "the defendant, like the plaintiff, is the master of its own case. A defendant is not compelled to

pursue affirmative defenses; it may instead resist liability on the theory that the plaintiff cannot, or has not, carried her own burden of proof." *Id.* at 763. Shafer contends that those principles apply here, and the trial court should have granted its motion to withdraw the nonparty defense.

But in *Bauer*, while the district court agreed not to instruct the jury that the defendant had the burden to prove the Act of God affirmative defense, the court did instruct the jury as follows:

If you decide that the defendant was at fault and that its fault was a proximate cause of the death of the plaintiff's decedent, it is not a defense that something else may also have been a cause of the death.

However, if you decide that the sole proximate cause of the death of the plaintiff's decedent was something other than the conduct of the defendant, then your verdict should be for the defendant.

*Id.* at 762. Thus, after hearing argument throughout the trial that the weather was to blame for the accident, the jury was instructed on how to consider that factor in determining proximate cause.

Here, a preliminary jury instruction explained that Shafer had asserted a nonparty defense for which it bore the burden of proof. Specifically, the jury was instructed that "nonparties Kerry Stichnoth and Commonwealth Engineering were contributorily at fault" and that Shafer had the burden of proving those defenses by a preponderance of the evidence. Appellees' App. at 4. The trial court was concerned that in light of that preliminary instruction and the evidence concerning those nonparties' conduct presented throughout trial, the verdict forms had to include those nonparties to avoid substantial confusion among the jurors.

In sum, Shafer contends that the evidence presented at trial warranted a change in its trial strategy, which led to the decision to move to withdraw the nonparty defense. But the Stichnoths point out that the extensive discovery conducted in this case was more than adequate to permit Shafer the opportunity to decide on the nonparty defense ahead of trial. Indeed, Shafer does not direct us to any differences in the evidence obtained during discovery and presented at trial. Shafer also asserts that the arithmetic of the jury's verdict shows that it was prejudiced by the trial court's denial of its motion to withdraw nonparty defense. Shafer contends that it was "on the cusp" of a defense verdict when the jury assigned 50% fault to Justin and, thus, that the jury would have likely returned a defense verdict but for the nonparty defense. We cannot agree. That is mere speculation.

The trial court had broad discretion in ruling on this issue. And the trial court carefully considered the issue before denying the motion on the basis of undue jury confusion. We agree with the trial court's recognition that the nonparty defense was a part of the "fabric of the case" by the time of final arguments. Shafer has not demonstrated that the trial court abused its discretion when it denied its motion to withdraw its nonparty defense at the conclusion of the trial.

Affirmed.

MATHIAS, J., and BRADFORD, J., concur.