# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 13 2017, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Nathaniel Lee
Laura R. Crowley
Lee & Fairman, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Peter H. Pogue
Michael F. Mullen
Justin C. Kuhn
Schultz & Pogue, LLP
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Mary and Ronald McDaniel, Individually and as Administrators of the Estate of Christopher L. McDaniel, Deceased,

*Appellants-Petitioners,*

v.

Stephen W. Robertson, Commissioner of the Indiana Department of Insurance,

*Appellee-Respondent.*

September 13, 2017

Court of Appeals Case No. 49A02-1610-PL-2298

Appeal from the Marion Superior Court

The Honorable James B. Osborn, Judge

Trial Court Cause No. 49D14-1510-PL-34509

**Najam, Judge.**

## Statement of the Case

Mary and Ronald McDaniel ("the McDaniels"), individually and as the administrators of the estate of their deceased son, Christopher L. McDaniel ("Christopher"), appeal the trial court's judgment on their petition for excess damages from the Indiana Patient's Compensation Fund ("PCF").[1]  The McDaniels raise two issues for our review, which we restate as follows:

1. Whether the evidence presented by the PCF with respect to Christopher's life expectancy constituted an impermissible new argument on the issue of liability.

2. Whether the trial court abused its discretion when it admitted expert testimony on Christopher's life expectancy.

We affirm.

## Facts and Procedural History

On May 15, 2007, Christopher, who was thirty-one-years-old and weighed more than 500 pounds, was taken to the emergency room at Fayette Memorial Hospital for evaluation based on symptoms of severe abdominal pain, nausea, vomiting, and shortness of breath.  When he arrived, Dr. Philip C. Lam evaluated Christopher.  After reviewing Christopher's blood work, Dr. Lam determined that Christopher had very low levels of potassium, which can cause

---

[1] The McDaniels named Stephen W. Robertson, in his official capacity as the Commissioner of the Indiana Department of Insurance, as the respondent to their petition.

cardiac arrhythmia. Dr. Lam gave Christopher 75 micrograms of potassium. Shortly after he had administered the potassium, and without checking Christopher's potassium levels a second time, Dr. Lam discharged Christopher with instructions to follow up with his primary care physician. Christopher was morbidly obese, and he had mobility issues. As a result of those problems, Christopher was transported from the hospital via ambulance. Christopher's condition did not improve and, while in the ambulance, he continued to experience shortness of breath, abdominal pain, nausea, and vomiting. The ambulance then transported Christopher to Reid Hospital where he later died. The coroner determined that Christopher's cause of death was cardiac arrhythmia and morbid obesity.

[4] The McDaniels filed a proposed complaint with the Indiana Department of Insurance. After a unanimous medical review panel decided that Dr. Lam was negligent, the McDaniels filed a complaint with the trial court. The complaint alleged that Dr. Lam had failed to adequately treat Christopher's low potassium levels, which caused Christopher's death. On November 17, 2015, the McDaniels and Dr. Lam settled their claim. The McDaniels then filed a petition seeking excess damages from the PCF. The trial court held a bench trial on that petition on June 15-16, 2016, to determine the amount of damages that the PCF owed to the McDaniels. The trial court took judicial notice of the life tables in the National Vital Statistics Report, which set the life expectancy for Christopher, as a thirty-one-year-old white male in the United States, at 46.5 years. The court also admitted into evidence Christopher's medical records.

At trial, the PCF moved to admit the video-recorded deposition of its expert witness, Dr. Martin Tobin. The court admitted Dr. Tobin's testimony over the McDaniels' objection. Dr. Tobin is a physician who is board certified in internal medicine, pulmonary medicine, and critical care medicine. He has been a practicing physician for forty-one years. Dr. Tobin testified that he had reviewed Christopher's medical records and determined that Christopher had a number of serious diseases that would have negatively impacted his health. These included obesity, bipolar disorder, alcoholism, impaired mobility, congestive heart failure, sleep apnea, low testosterone, lymphedema, previous deep vein thrombosis, a diagnosis of pulmonary embolism, hypertension, and hyperlipidemia. Dr. Tobin further testified that, during his tenure as a physician, he has evaluated "thousands of patients and patients with the various disorders" like those of Christopher. Appellants' App. Vol. II at 64. In addition to reviewing Christopher's medical records, Dr. Tobin also testified that he read "studies that have been performed where researchers have estimated the effect of these different disorders on the projected life expectancy" of patients. *Id.* Based on the medical records, his forty-one years of experience, and the literature he had reviewed, Dr. Tobin estimated that Christopher's life expectancy would have been an additional two to four years had he not died.

The McDaniels cross-examined Dr. Tobin to determine how he had reached his estimate on Christopher's life expectancy. The following dialogue occurred:

> [McDaniels' counsel] Q: But give me the math. Give me a breakdown of how you come from 46.8 down to four? So—

A: Because—

Q: So 44 years, account for the 44 years that you say that he would have died. So give me the condition out of those 44 years, each one, step by step, to say that he would have died from this condition in X amount of years based on my calculation?

A: But I'm telling you that based on—

Q: I know it's about your experience. I just want you to give me the math, just the math.

A: It is—it is taking into the account the influence of the various conditions. As you, yourself have mentioned, there's going to be overlapping contributions of different conditions that [are] occurring simultaneously. And so all of these various conditions are happening simultaneously and in aggregate, then they come down to shortening his life expectancy by two to four years.

Q: Okay. So the 44 years, which condition of the three will shorten his life—give me the math of each medical condition and the number of years that you cumulatively add up would shorten his life expectancy? I'm only talking about the number 44 now. 44 is the—

A: I've . . . answered this a number of times to you, Mr. Lee. I'm telling you—

Q: I know, but I'm saying specifically—

A: —that I'm taking into account the shortening of life expectancy that results from his obesity. This is going to cause a certain shortening of his life expectancy. Then the bipolar disease, the alcoholism, impaired mobility, the congestive heart

failure, the sleep apnea, they are all going to overlap. And so in terms of taking the aggregate of all these various conditions together, then I calculate out that his life . . . .

\* \* \*

THE WITNESS: Mr. Lee I pointed out to you that all of these are occurring simultaneously. That's why it doesn't permit itself to be added as adding each one separately individually. That's why—because they're all occurring concurrently and simultaneously. I'm taking all of the research that has been conducted on these different studies, what has been the scientific bas[is] of all the [sentence missing] combining that with my 41 years of experience of taking care of patients with these problems and using both of these evidence bases to come up with my calculation of a life expectancy [of] two to four years.

\* \* \*

Q: Let's try it this way, based on those tables, the greatest loss of life expectancy from those tables you cited was alcohol abuse and that reduced life expectancy by 22 years.

So how you then may have reduced the life expectancy further if people that have alcohol disease also have concurrent morbidities such as the bipolar disease, [being] overweight. That's one of the problems that alcoholism can cause. So the patient would have the same concurrent conditions.

And secondly, none of these studies have the combined effect of all these disease process in the mathematical computation, correct?

A: So, Mr. Lee, I mean, this is exactly the point I keep making. I mean, that all of these are occurring simultaneously in [Christopher]. He is not somebody with simple alcoholism. Therefore, doing a calculation simply based on alcoholism doesn't apply to him because he also has other conditions and that is why I steered away from doing the – what you want me to do is doing a simple addition. But I'm pointing out that that is not germane in this condition because you have correctly pointed out in your last question, these things are occurring simultaneously. And it's based on that recognition that they're occurring simultaneously, that's why I did my aggregate calculation of two to four years.

*Id*. at 96-97.

[7]     During trial, the trial court also admitted the deposition of the PCF's expert witness, Dr. Robert Jeffrey Mara. Dr. Mara is an emergency physician who has been licensed as a physician since 1995 and who is board certified in emergency medicine. During his deposition, Dr. Mara testified that Christopher's "health was poor" and he "had multiple medical problems which, at that time, did not appear to be adequately treated." *Id*. at 31. Dr. Mara testified that all of Christopher's preexisting medical conditions were treatable and that death would have been preventable. However, Dr. Mara did not provide any testimony on what Christopher's life expectancy would have been had he not died on May 15, 2007.

[8]     On July 5, 2016, the trial court entered its findings of fact and conclusions of law. The trial court made the following findings of fact:

4. Christopher's health problems intensified in 2006 and continued through 2007. In January 2007, Christopher weighed around 500 pounds. His legs were swollen. He could not get up by himself. He did not take his med[ication]s regularly.

5. Prior to his death, Christopher had been diagnosed with morbid obesity, bipolar disease, alcoholism, impaired mobility, congestive heart failure, sleep apnea, low testosterone, lymphedema, prior deep vein thrombosis, pulmonary embolism, hypertension, and hyperlipidemia.

* * *

10. In a medical negligence action filed against Christopher's medical care providers by [the McDaniels] as Administrators of Christopher's Estate, it was determined that Dr. Phillip Lam failed to meet the appropriate standard of care when treating Christopher and that Dr. Lam's failure was a factor in Christopher's death.

* * *

26. Based upon the 2007 United States Life Table National Vital Statistics Report, the life expectancy of a 31[-]year[-]old white male was 46.5 years. This life table is a "snapshot" of current mortality experience and shows the long-range implications of a set of age-specific death rates that prevailed in a given year. It does not take into account the adverse effects of a particular person's specific health conditions.

27. Martin Tobin is a physician specializing in internal medicine, pulmonary medicine, and critical care medicine. He has been board certified in all three areas and remains board certified in internal medicine and pulmonary medicine. He also is a critical

care specialist (an intensivist) who takes care of patients who are admitted into intensive care units. He has been a physician since 1976.

28. Dr. Tobin is a professor of medicine in the division of pulmonary and critical care medicine, Department of Internal Medicine at Loyola University of Chicago Stritch School of Medicine. In this position he takes care of patients, teaches medical students, residents, and fellows, and conducts research. All of Dr. Tobin's time is spent in clinical medicine.

29. Dr. Tobin serves as a consultant to the Committee on Promotion and Tenure for 44 universities including Dartmouth, Duke, Harvard, Johns Hopkins, the Mayo Clinic, and Yale. He has received several teaching awards, edited several books, and written hundreds of printed and electronic articles on a host of medical topics for peer-reviewed publications. He also has served as a manuscript reviewer for 30 medical publications including the New England Journal of Medicine and the Journal of the American Medical Association.

30. Based upon a review of Christopher's medical records, a review of literature on life expectancies, his training, and his experience taking care of thousands upon thousands of patients with similar disorders over the period of 41 years, Dr. Tobin concluded that, had Christopher received the proper medical care on May 15, 2007, he could have expected to live another two to four years.

31. Dr. Tobin expressly stated that his estimation of Christopher's life expectancy was based upon a "calculation" Dr. Tobin performed. But Dr. Tobin could not describe the calculation he used to make his estimate, thus making it impossible to evaluate whether his calculation has ever been tested within the scientific community. Therefore, no weight will

be placed upon Dr. Tobin's calculations. Significant weight is given, however, to Dr. Tobin's opinion based upon his extensive training, education, and 41 years of experience with patients like Christopher.

32. Balancing the longevity associated with Christopher's family, Christopher's positive efforts to address his health problems, the National Vital Statistics Reports, and Dr. Tobin's expert opinion, it is more likely than not that Christopher could have survived six more years.

Appellants' App. Vol. VI at 5-6, 8-10. The trial court then concluded that Christopher's two children had been deprived of six years of his love, care, and affection, and it awarded them each $300,000. The court also awarded $8,400 to Christopher's estate for funeral and burial expenses. As such, the trial court found against the PCF in the amount of $358,400.[2]

On August 5, 2016, the McDaniels filed a motion to correct error and set aside the judgment, which the trial court denied on September 12. This appeal ensued.

## Discussion and Decision

The trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). This court has outlined the standard of review when the trial court has issued such findings and conclusions:

---

[2] As a matter of law, the PCF is not liable for the first $250,000 in damages.

In reviewing a judgment based on such findings, we must first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Atterholt v. Robinson,* 872 N.E.2d 633, 638-39 (Ind. Ct. App. 2007). "[T]he court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Randles v. Ind. Patient's Comp. Fund,* 860 N.E.2d 1212, 1219 (Ind. Ct. App. 2007) (citation omitted), *trans. denied.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Johnson v. Wysocki,* 990 N.E.2d 456, 460 (Ind. 2013). "In either case, we must be left with the firm conviction that a mistake has been made." *Id.* (citation and internal quotation marks omitted). When the specific issue on appeal relates to the award of damages, we will affirm the damage award if it was "within the scope of the evidence before the trial court." *Smith v. Washington,* 734 N.E.2d 548, 550 (Ind. 2000). In conducting our review, we consider only the evidence favorable to the judgment and the reasonable inferences to be drawn therefrom. *Samples v. Wilson,* 12 N.E.3d 946, 950 (Ind. Ct. App. 2014). We do not reweigh the evidence. *Id.*

*Green v. Robertson*, 56 N.E.3d 682, 691 (Ind. Ct. App. 2016).

### *Issue One: New Argument on Liability*

The McDaniels first contend that the evidence presented by the PCF regarding Christopher's life expectancy impermissibly amounted to a new argument on the issue of liability and that, on the question of liability, the PCF was bound by

the settlement agreement between the McDaniels and Dr. Lam.[3] The McDaniels assert that "the theory of liability was established under proximate cause." Appellants' Br. at 10. They then argue that the "PCF defense is opposite of the position taken by its insured physician. The PCF cannot raise a new defense that [Christopher] was going to die anyway because he was obese, drank too much, and [was] bipolar." *Id.* at 10-11.

[12] In support of their claim, the McDaniels rely on Indiana Code Section 34-18-15-3(5), which provides:

> If a health care provider or its insurer has agreed to settle its liability on a claim by payment of its policy limits established in IC 34-18-14-3(b) and IC 34-18-14-2(d), and the claimant is demanding an amount in excess of that amount, the following procedure must be followed:
>
> * * *
>
> (5) At the hearing, the commissioner, the claimant, the health care provider, and the insurer of the health care provider may introduce relevant evidence to enable the court to determine whether or not the petition should be approved if the evidence is submitted on agreement without objections. If the commissioner, the health care provider, the insurer of the health care provider, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, the court shall, *after hearing any relevant evidence on the issue of claimant's*

---

[3] It is unclear exactly what the McDaniels argue in this issue on appeal. To the extent that they argue about increased risk of harm, it does not apply in this case as liability had already been established by the settlement agreement. *See e.g. Robertson v. B.O.* 977 N.E.2d 341 (Ind. 2012)

*damage[s] submitted by any of the parties described in this section*, determine the amount of claimant's damages, if any, in excess of the health care provider's policy limits established in IC 34-18-14-3(b) and IC 34-18-14-3(d) already paid by the insurer of the health care provider. The court shall determine the amount for which the fund is liable and make a finding and judgment accordingly. In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established.

(Emphasis added.) The McDaniels argue that the "PCF is precluded from tendering Dr. Tobin's new opinion testimony" pursuant to that statute. Appellants' Br. at 14.

However, the McDaniels fail to take into consideration the part of the statute that allows the court to hear relevant evidence to assist it in determining the amount of damages owed by the PCF. The PCF introduced this evidence to assist the trial court in determining the damages owed as a result of the negligence, not to dispute liability. Thus, we conclude that the expert testimony of Dr. Tobin did not constitute an impermissible new argument on the issue of liability but was, instead, permissible evidence on the issue of damages. The McDaniels' contention on this issue is without merit.

## Issue Two: Expert Testimony

The McDaniels also assert that the trial court erred both when it admitted the expert testimony of Dr. Tobin regarding Christopher's life expectancy and when it gave that testimony weight. We address each argument in turn.

*Admission of Testimony*

[15]     The McDaniels contend that the trial court erred when it admitted the testimony of Dr. Tobin as evidence because the "testimony lacked scientific reliability." Appellants' Br. at 18. As the Indiana Supreme Court has held:

> A trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion and will be reversed only for abuse of that discretion. *TRW Vehicle Safety Sys., Inc. v. Moore,* 936 N.E.2d 201, 216 (Ind. 2010) (citations omitted). We presume that the trial court's decision is correct, and the burden is on the party challenging the decision to persuade us that the trial court has abused its discretion. *Id.*

> The trial court is considered the gatekeeper for the admissibility of expert opinion evidence under Rule 702. *Doe v. Shults–Lewis Child & Family Servs., Inc.,* 718 N.E.2d 738, 750 (Ind. 1999). With regard to the admissibility of expert testimony, Rule 702 provides:

>> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

>> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

> Ind. Evidence Rule 702. "By requiring trial courts to be satisfied that expert opinions will assist the fact-finder and that the underlying scientific principles are reliable, Rule 702 guides the

admission of expert scientific testimony." *Sears Roebuck & Co. v. Manuilov,* 742 N.E.2d 453, 460 (Ind. 2001) (plurality opinion). Once the admissibility of the expert's opinion is established under Rule 702, "then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact." *Id.* at 461 (citation omitted).

*Bennet v. Richmond*, 960 N.E.2d 782, 786-87 (Ind. 2012).

[16]    The McDaniels do not dispute that Dr. Tobin has the credentials to satisfy Rule 702(a). They assert only that Dr. Tobin's testimony was inadmissible because it did not meet the "criteria with respect to Indiana Rule of Evidence 702(b)." Appellants' Br. at 18.

[17]    In determining the admissibility of evidence under Rule 702, "the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Bennet,* N.E.2d at 791 (quoting *Shafter & Freeman Lakes Envtl. Conservation Corp. v. Stichnoth*, 877 N.E.2d 475, 484 (Ind. Ct. App. 2007), *trans. denied*). While there are relevant factors to consider, "[t]here is no specific test or set of factors which must be considered in order to satisfy Evidence Rule 702." *Hannah v. Pest Control Servs., Inc.*, 734 N.E.2d 674, 679-80 (Ind. Ct. App. 2000), *trans. denied.* In other words, application of Rule 702 is not mechanical and is within the trial court's discretion.

[18]     Dr. Tobin testified that, had the malpractice not occurred, Christopher would have lived another two to four years.  The trial court properly recognized that Dr. Tobin was not able to articulate a specific calculation he used to determine Christopher's life expectancy and, therefore, gave no weight to Dr. Tobin's calculations.  Instead, Dr. Tobin relied upon his extensive past experience, Christopher's medical records, and other research he had reviewed.  Based on these factors, the trial court gave significant weight to Dr. Tobin's opinion.  When expert testimony is based upon skill or experience rather than on a specific scientific principal,

> the proponent of the testimony must only demonstrate that the subject matter is related to some field beyond the knowledge of lay persons and that the witness possesses sufficient skill, knowledge or experience in the field to assist the trier of fact to understand the evidence or determine a fact in issue.

*Norfolk S. Ry. v. Estate of Wagers,* 833 N.E.2d 93, 102 (Ind. Ct. App. 2005), *trans. denied.*

[19]     The expert testimony at issue on this appeal concerns Christopher's life expectancy.  A person's life expectancy is beyond the knowledge of a lay person.  As discussed above, Dr. Tobin has been a physician for forty-one years and is board certified in critical care medicine.  During his tenure as a physician, Dr. Tobin has treated thousands of patients who had conditions similar to Christopher's.  Based on Dr. Tobin's extensive experience, we cannot say that the trial court abused its discretion when it admitted his video deposition testimony into evidence.

*Reliance on Testimony*

[20]     Finally, throughout their brief, the McDaniels assert that the trial court erred when it gave weight to Dr. Tobin's testimony. Specifically, the McDaniels contend that the trial court erred when it relied on the expert testimony when it determined that Christopher would have lived an additional six years had the malpractice not occurred on May 15, 2007. However, the McDaniels' argument is simply a request that we reweigh the evidence, which we cannot do. *See e.g. Green*, 56 N.E.3d at 691.

[21]     In sum, the PCF's argument during the damages hearing did not amount to a new defense, the trial court did not abuse its discretion when it admitted Dr. Tobin's expert testimony as evidence, and we cannot say that the trial court erred when it gave weight to Dr. Tobin's testimony. As such, we affirm the trial court's judgment.

[22]     Affirmed.

Kirsch, J., and Brown, J., concur.