

FILED

Dec 10 2015, 8:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Samuel L. Bolinger
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE

Patrick L. Proctor
Fort Wayne, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

Auto Liquidation Center, Inc.,
and Majid Zojaji (a/k/a Mike
Zojaji), Individually

*Appellants-Defendants,*

v.

Jorge Chiqui Chaca,

*Appellee-Plaintiff*

December 10, 2015

Court of Appeals Case No.
02A05-1503-PL-00131

Appeal from the Allen Superior
Court

The Honorable Stanley Levine,
Judge

Trial Court Cause No.
02D01-1204-PL-000131

**Vaidik, Chief Judge.**

# Case Summary

[1] Auto Liquidation Center (ALC), whose owner is Majid "Mike" Zojaji, repossessed a Dodge Charger that it sold on credit to Jorge Chiqui Chaca. Initially the car was repossessed because Zojaji erroneously believed that Jorge was behind in payments. After Jorge proved he was current in his payments,

Zojaji refused to return the car to Jorge, claiming instead that he confiscated the car because Jorge had disconnected the GPS—a GPS that Zojaji had used to disable Jorge's car for alleged non-payment. Ultimately, Zojaji never returned the car or its contents to Jorge and sold it at auction. A jury found that ALC and Zojaji converted Jorge's car and awarded damages and treble damages under Indiana Code section 34-24-3-1. ALC and Zojaji appeal the judgment arguing that there is insufficient evidence to show that they had the intent to exert unauthorized control over Jorge's property. They also complain that the damages awarded were excessive. We find sufficient evidence of intent, affirm the damage award, and order the case remanded to the trial court to award reasonable appellate attorney's fees to Jorge. We also warn that self-help is a perilous and potentially expensive path.

## Facts and Procedural History

On November 25, 2011, Jorge bought a 2008 Dodge Charger from Auto Liquidation Center, Inc. (ALC), which is owned and operated by Zojaji and located in New Haven, Indiana. Jorge agreed to purchase the car for $14,500. Jorge paid $4000 as a down payment at the time of purchase, and agreed to pay ALC the remaining balance through forty-eight, twice-monthly installment payments: forty-seven payments of $250 and one payment of $435.35. The payments were to begin on December 10, 2011.

As a condition of the deal, Jorge agreed to the car being equipped with a GPS device. Jorge signed a document entitled "Disclosure Statement and

Agreement for Installation," providing that installing and maintaining a GPS device in the car was a material condition for ALC to finance the loan secured by the vehicle; that tampering with, altering, disconnecting, or removing the device was grounds for default under the agreement; and that any default entitled ALC to take "any and all actions, including but not limited to, repossession and sale, as may be allowed under the terms of the Contract." Ex. 5. ALC uses GPS devices for three purposes: (1) to track the location of cars it has sold; (2) to send a warning signal to customers who are late on payments; and (3) to send an electronic signal that disables a car's starter system to aid in the repossession of a car. *See* Tr. p. 228-32, 368-71. A GPS was installed in the car.[1]

[4] Jorge timely made his first payment to ALC on December 10 by hand-delivering his check to ALC. Each of his payments was made in this manner. ALC staff entered Jorge's payments in a computer and handwrote each payment in a black ledger book, which acts as a back-up to the computer system. *See* Tr. p. 219. The black book is a "fail-safe" against computer errors, and the best way to double-check whether a payment was missed. *See id*. at 220.

---

[1] On three separate occasions—twice in December 2011 and once in March 2012—ALC sent commands to the GPS device installed on Jorge's car to locate the car and test the GPS device. *See* Ex. 28.

[5] Jorge's first payment in December was a double payment of $500. His next payment on January 10, 2012, was a single payment of $250, followed by a double payment of $500 on January 30 and another double payment on February 27. But ALC erroneously entered the February 27 payment as a single payment, which didn't "push his due date out properly," even though the amount entered in the computer and Jorge's receipt clearly state the payment amount was $500. *See* Ex. 22; Tr. p. 221. As of February 27, approximately 90 days after the sale, Jorge had made $1750 in car payments in addition to the initial $4000 down payment.

[6] In mid-March, when Jorge's next payment would have been due if he had not made a double-payment at the end of February, ALC's computer system generated a report that was given to Zojaji, which stated that Jorge had missed a payment on March 10. Without double-checking the black ledger book to see whether Jorge had, in fact, missed a payment, Zojaji ordered Jorge's car repossessed, and on March 13 at 8:28 p.m., according to the "IMETRIK" report, a "starter disable" command was sent via the GPS device. *See* Ex. 28 (the IMETRIK report).[2]

[7] On March 15 Jorge's wife took the car to Jesse's Auto Repair, complaining that the check-engine light was on, there was a "dinging" noise coming from the

---

[2] IMETRIK is described on its website as an "end-to-end car tracking solution" that enables the user to "interact in real-time with a vehicle in which a telematics device is installed." *See* http://www.imetrik.com/en/solutions#vehicle-finance-telematics (last visited Nov. 18, 2015).

dashboard, and she was unable to shift into the lower gears of her transmission. Ex. 29 (Affidavit of Mark Kapocius). The mechanic determined the GPS device was improperly installed in the car causing damage that ultimately would have resulted in irreparable damage to the transmission. *Id.* The mechanic, therefore, disconnected the offending GPS device, without notice to Jorge, until Jorge picked up the car at Jesse's Auto Repair when it was about to close for the day. Jorge was told that the GPS could be reconnected the next day. But by the time Jorge awoke the next morning, ALC had repossessed the car at the direction of Zojaji.

[8] Jorge called ALC and asked for an explanation. Zojaji told him the car was repossessed because Jorge "hadn't paid." Tr. p. 88. Jorge advised Zojaji that he was not behind on payments but one payment ahead, and that his receipts were in the repossessed car. Jorge then went to ALC to get the receipts out of the car; as he reached in the car to get the receipts, Zojaji inexplicably "slammed the door[,]" hitting Jorge. *Id.* at 90. Jorge nonetheless got the receipts out of the car and showed them to Zojaji, who was yelling and "very angry." *Id.* at 92. Zojaji inspected the receipts and then claimed, "I took the car because you had disconnected a GPS." *Id.*

[9] Jorge explained to Zojaji that Jesse's Auto Repair had removed the GPS device without Jorge's permission because the mechanic had determined that it was improperly installed and damaging the car. Zojaji demanded to know the mechanic's name and number, which Jorge provided. After speaking with Zojaji on the telephone, the mechanic accompanied Jorge to ALC with the

GPS device and the tools to connect it. But Zojaji would not allow him to reinstall the device, and made them leave the dealership. Upon Zojaji's office-manager's suggestion to have ALC's "GPS guy" check out the car, it was confirmed that the GPS was improperly installed and each command ALC sent to Jorge's GPS device was causing damage to the car. *Id.* at 238.

[10] The office manager further recommended to Zojaji that ALC return the car to Jorge. Zojaji, who was "furious," said he would not return the car because Jorge "had been a pain in the tush from day one." *Id.* at 235, 236. In Zojaji's words, Jorge was a "lay-away deal"—he had "basically zero credit," and Zojaji "was banking on the fact that they were going to miss a payment here or there and he would get this car back." *Id.* at 241.

[11] At the time ALC repossessed Jorge's car, Jorge had certain personal items inside the car—some clothing, music CDs, electronic cables, and his minor daughter's school project—all worth between $543 and $690. Through his attorney, Zojaji promised to return the personal items to Jorge, but never did.

[12] On April 25, 2012, Jorge filed his original complaint against Zojaji and ALC. Approximately eight months later, in December of 2012, Zojaji sold the car at auction for $10,400 using one of two blank limited-power-of-attorney forms Jorge had signed at the time of the initial sale. In order to obtain clear title to the car, Zojaji had filled out the form and engaged a notary to falsely certify that Jorge had signed the form on April 27, 2012—two days after Jorge had filed his first complaint.

Jorge alleged in his complaint and amended complaint criminal conversion, assault, and general damages; and a violation of the Truth in Lending Act, 15 U.S.C. §1601 *et seq.* (TILA). A jury returned a verdict for Jorge on all counts, awarding damages in the amount of $45,883.86 for the conversion claim. The trial court entered a final judgment for Jorge in the amount of $121,069.66, which included prejudgment interest and attorney's fees.[3] ALC and Zojaji now appeal.

# Discussion and Decision

## 1. Sufficiency of the Evidence of Criminal Conversion

On appeal, ALC and Zojaji challenge the sufficiency of the evidence supporting the jury's verdict against them on the criminal conversion claim. Our standard of review of sufficiency-of-the-evidence challenges is the same in civil cases as in criminal cases. *Indian Trucking v. Harber*, 752 N.E.2d 168, 172 (Ind. Ct. App. 2001). We consider only the evidence most favorable to the verdict and the reasonable inferences to be drawn therefrom. *Id.* We do not reweigh the evidence or judge the credibility of the witnesses. *Id.* This Court will affirm the verdict unless we conclude that it is against the great weight of the evidence. *Id.*

---

[3] In the order or judgment of the court, the trial court also imposed post-judgment interest and court costs. *See* Appellee's App. p. 1.

[15]     In order to prove that ALC and Zojaji criminally converted Jorge's car and other personal property inside the car, Jorge had to prove by a preponderance of the evidence that ALC and Zojaji "knowingly or intentionally exert[ed] unauthorized control" over his property. *See* Ind. Code § 35-43-4-3; *see also Larson v. Karagan*, 979 N.E.2d 655, 661 (Ind. Ct. App. 2012) (providing that in a criminal conversion action, criminal intent must be proven by a preponderance of the evidence). The mens rea requirement differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt—situations the criminal conversion statute was not intended to cover. *Larson*, 979 N.E.2d at 661. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b). To "'exert control over property' means to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Ind. Code § 35-43-4-1(a). And a person's control over property of another person is "unauthorized" if it is exerted without the other person's consent. I.C. § 35-43-4-1(b)(1).

[16]     Here, the evidence shows that ALC/Zojaji repossessed Jorge's car because he erroneously believed that Jorge had missed a payment.[4] Only after Jorge

---

[4] The appellants argue in their reply brief that "Extra payments by Jorge did not excuse him from making his March payment by the 10th of the month." Appellants' Reply Br. p. 6. First, we find this argument is waived because "[n]o new issues shall be raised in the reply brief." *See* Ind. Appellate Rule 46(C). And in

showed Zojaji receipts proving that he was current on his payments, did Zojaji claim to have repossessed the car because Jorge had disconnected the GPS device. Even after Zojaji learned that the GPS was disconnected because of the irreparable damage it was causing to the car and that Jorge's mechanic would reinstall the device, Zojaji refused to give Jorge either his car or his personal belongings. We find the evidence supports the conclusion that Zojaji knowingly or intentionally exerted unauthorized control over Jorge's property—namely, the car and the personal items contained therein. *See Palmer Dodge v. Long*, 791 N.E.2d 788 (Ind. Ct. App. 2003) (holding that there was sufficient evidence to support criminal-conversion finding against dealership where the dealership had possession of the buyer's purchased car but refused to give back the buyer's trade-in car). In this case, even if Zojaji initially repossessed the car due to a genuine misunderstanding as to the allegedly missed payment or the removal of the GPS device, once those misunderstandings were clarified, Zojaji simply had no reason—contractual or otherwise—to keep Jorge's car.[5]

---

any event, we find the argument has no merit because the evidence shows that Jorge had on two prior occasions—on December 10, 2011, and January 30, 2012—made one monthly payment of $500 (rather than two $250 payments), and ALC/Zojaji had not objected to this or asserted that Jorge was in default.

[5] In their brief, Appellants assert that Jorge had "several opportunities to get the car back and the personality [sic] therein[,]" but the evidence shows that Jorge could only get the car back by paying the promissory note in full or paying money beyond what Jorge owed under the contract. *See* Appellants' Br. p. 27. As to the personal property, it appears that initially Zojaji said he would give it to his attorney but then allegedly lost the property. *See* Appellee's Br. p. 17.

[17] ALC and Zojaji maintain, however, that Zojaji "firmly believed that he had a legal contractual right to repossess the car due to [Jorge]'s removal of the GPS device." Appellants' Br. p. 22. And, the argument continues, "Appellant cannot be guilty of conversion because his control over the vehicle was not 'unauthorized.' He had no 'mens rea.'" *Id.* This argument is nothing more than a request for us to reweigh the evidence, which we cannot do. To support their contention, however, ALC and Zojaji cite to *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156 (Ind. Ct. App. 2008). In that case, a commercial tenant was appealing from a summary judgment in favor of the landlord after the tenant alleged that the landlord had committed conversion by overcharging the tenant for its share of real estate taxes due under the lease. The trial court found—and this Court agreed—that the tenant's claim constituted a bona fide contract dispute and not a claim for conversion. *See id.* at 1166-67.

[18] But *French-Tex* is distinguishable from this case, for at least two reasons. First, there was sufficient evidence here for the jury to find that this was never a bona fide contract dispute. Even if the jury believed that Zojaji had initially acted on a mistaken belief that Jorge missed a payment, the evidence supports that the misunderstanding morphed into an intentional, unauthorized taking of Jorge's property. In other words, when Zojaji realized Jorge was *not* behind in his payments and that he, Zojaji, had wrongfully disabled Jorge's car via the GPS device, which resulted in Jorge's mechanic needing to disconnect the GPS to prevent further damage to the car, the jury could very well have concluded that Zojaji's continued possession of the car constituted conversion. As to the

second distinction, in *French-Tex* the tenant was appealing from a negative judgment, whereas here Jorge prevailed in the trial court; thus, we must decline the appellants' ongoing invitation to reweigh the evidence of Zojaji's intent. Our standard of review requires us to consider only the evidence most favorable to the verdict unless we conclude that it is against the great weight of the evidence. *See Indian Trucking*, 752 N.E.2d at 172. Because we cannot say that is the case here, we affirm the finding of criminal conversion.

## 2. Damages Award

[19] Next ALC and Zojaji allege that the damages awarded by the jury were excessive. The jury has broad discretion in determining an award of damages, and when the evidence is conflicting, the jury is in the best position to assess the damages. *Cox v. Matthews*, 901 N.E.2d 14, 23 (Ind. Ct. App. 2009), *reh'd denied*, *trans. denied*. Therefore, when reviewing a jury verdict containing a damage award claimed to be excessive or inadequate, this Court applies a strict standard. *Ritter v. Stanton*, 745 N.E.2d 828, 843 (Ind. Ct. App. 2001). We consider only the evidence that supports the award along with the reasonable inferences therefrom, and a damage award will be upheld if it falls within the bounds of the evidence. *Id*. If there is any evidence to support the amount of the award, even if it is conflicting, this Court will not reverse that award. *Id*. Where the damage award is so outrageous as to indicate the jury was motivated by passion, prejudice, partiality, or consideration of improper evidence, we will find the award excessive. *Id*. at 844. But the jury's damage award will not be

deemed the result of improper considerations if the size of the award can be explained on any reasonable ground. *Id*.

[20] In this case, Jorge's conversion claim arises under Section 34-24-3-1, which provides for—among other things—treble damages to a person who has suffered a pecuniary loss as a result of certain crimes, including criminal conversion. The record reflects that the jury's damage award was based on the value of the car and the personal property contained in the car. In his appellate brief, Jorge discusses the range of reasonable damage awards based on the evidence that was before the jury, based on the car being priced somewhere between $10,400 (the price for which the car was sold at auction in December 2012) and $18,900 (the original sale price listed on the internet in November 2011), plus the personal property contained therein valued somewhere between $543 and $690, resulting in a range of between $10,943 and $19,590. When these amounts are trebled, as authorized by the statute, the range is between $32,829 and $58,770. Therefore, the jury's award of $45,883.86 is clearly within the range supported by the evidence. *See* Appellee's Br. p. 19. Further, ALC/Zojaji offer no evidence that the jury's damage award was motivated by passion, prejudice, partiality, or consideration of improper evidence. *See Ritter*, 745 N.E.2d at 844. Thus, ALC/Zojaji does not meet the strict standard we

apply when reviewing jury-awarded damages, and we will not reverse the damage award on these grounds.[6]

## 3. Appellate Attorney's Fees

[21] Finally, Jorge contends that he is entitled to an award of additional attorney's fees for this appeal, basing this contention on Section 34-24-3-1, which allows for the recovery of attorney's fees. Specifically, the statute provides in relevant part that "a person [who] suffers a pecuniary loss as a result of a violation of IC 35-43 . . . may bring a civil action against the person who caused the loss for . . . a reasonable attorney's fee." Ind. Code § 34-24-3-1. The trial court appropriately assessed "fair and reasonable" attorney's fees against ALC and Zojaji in the amount of $66,715. *See* Appellee's App. p. 1. The appellants do not challenge this award.

[22] This Court has consistently found that an award of attorney fees includes appellate attorney's fees—at least, as here, when the party seeking appellate fees has been successful on appeal. *See e.g., Benge v. Miller*, 855 N.E.2d 716, 722 (Ind. Ct. App. 2006); *see also Patricia Ann Brown, C.P.A. v. Brown*, 776 N.E.2d 394, 397 (Ind. Ct. App. 2002) ("While there are many cases holding that an award of attorneys' fees under Indiana Code § 34-24-3-1 should include

---

[6] Appellants frame their argument as a challenge to the jury verdict, but the trial court specifically did not enter judgment on that verdict. Instead, the trial court added 8% prejudgment interest to the jury award of $45,883.96, plus "fair and reasonable" attorney's fees in the amount of $66,715 (pursuant to both the TILA and conversion claims), for a total of $121,069.66, plus 8% post-judgment interest from January 21, 2015—the date of the trial court's order—and court costs. *See* Appellee's App. p. 1.

appellate attorneys' fees . . . our review of such cases finds that to be the situation only where the party seeking appellate fees has been successful on appeal."), *trans. denied*. Because we affirm the finding of criminal conversion, we affirm the trial court's judgment of $121,069.66 plus costs and post-judgment interest and remand for a determination of the appropriate amount of appellate attorney's fees and costs to be awarded to Jorge.

[23]   As a final note: justice is better dispensed in a courtroom and not in one's own hands. Self-help remedies are perilous and potentially expensive. When self-help is attempted, a jury or judge decides the appropriateness or inappropriateness of the actions regardless of how justified the actor may have thought his actions were. As we see here, the risks of paying damages, treble damages, pre-judgment interest, attorney's fees, appellate attorney's fees, and costs are not worth the possible benefits of sidestepping the court system.

[24]   Affirmed and remanded for a determination of reasonable appellate attorney's fees.

Robb, J., and Pyle, J., concur.