

**FILED**

Jul 28 2020, 8:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Megan L. Craig
John R. Craig
Richard P. Long
Craig & Craig, LLC
Merrillville, Indiana

Mark R. Anderson
Michael Anderson
Anderson & Anderson, P.C.
Merrillville, Indiana

ATTORNEYS FOR APPELLEE
DAVID A. BERGAL

Beth Brown Nowak
Kelly Law Offices LLC
Crown Point, Indiana

Michelle R. Canerday
Katten Muchin Rosenman LLP
Chicago, Illinois

Floyd D. Perkins
Nixon Peabody LLP
Chicago, Illinois

ATTORNEY FOR APPELLEE
JOSEPH M. SANDERS

Kevin E. Steele
Burke Costanza & Carberry LLP
Valparaiso, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Linda S. Bergal,

*Appellant-Defendant,*

v.

David A. Bergal and Joseph M. Sanders, as Successor-Trustee of the Milton B. Bergal Trust,

*Appellees-Plaintiffs*

July 28, 2020

Court of Appeals Case No. 19A-CT-1062

Appeal from the Porter Superior Court

The Honorable Mary R. Harper, Special Judge

Trial Court Cause No. 64D02-1702-CT-1500

**Baker, Judge.**

[1]     Linda Bergal (Linda) appeals after a jury found in favor of David Bergal (David) and Joseph Sanders on David and Sanders's complaint related to assets that were originally part of the trust of Milton Bergal (Milton), who was David's father and Linda's husband.  Linda raises the following arguments:  (1) the trial court erred by denying her motion to dismiss the breach of contract claim; (2) the trial court made a number of erroneous evidentiary rulings; (3) the trial court gave the jury an erroneous instruction and improper verdict forms; (4) the jury was permitted to craft an inappropriate equitable remedy; and (5) the verdict resulted in a double recovery.  We find that one of the assets at issue was never a part of the trust and consequently reverse the verdict with respect to that asset.  In all other respects, we affirm and remand for further proceedings.

# Facts

### *Underlying Facts*

[2]     Linda married Dr. Milton Bergal in 2009.  Milton had four adult children—three daughters[1] and one son, David.

[3]     In September 2009, Milton created an estate plan with the help of his attorney, Ben Roth, and his accountant, Sanders.  To that end, Milton executed the

---

[1] Milton disinherited his daughters, who do not participate in this appeal.

Milton B. Bergal Estate Trust (Trust) and a will. Milton was the trustee during his life, and in the event Milton was no longer able to act as trustee, Linda and Sanders were named as successor co-trustees. The Trust also provided for two sub-trusts to be funded upon Milton's death—Trust A, of which Linda was the primary beneficiary (with Linda and Sanders serving as co-trustees); and Trust B, of which David was the primary beneficiary and sole trustee. The Trust was funded with assets that included real and personal property.

[4] At some point, Milton lost ambulatory abilities and succumbed to multiple conditions affecting his mental status, including dementia and Alzheimer's disease.[2] During those years, six non-real-estate assets (the Assets) were moved out of the Trust,[3] with Linda being named as the primary beneficiary of the Assets. The Assets include the following accounts:

- Vanguard Rollover IRA Account (Vanguard IRA). This one is unique among the six because it was never included in the Trust. Milton designated Linda as its primary beneficiary on April 23, 2010.
- JPMorgan Chase IRA Account (JPMorgan IRA). Milton designated Linda as the primary beneficiary on March 1, 2013.
- Nicholas Fund Asset (Nicholas Fund). In October 2015, Linda transferred this asset by using her power of attorney from US Bank as Custodian to the JPMorgan IRA.
- JPMorgan Chase Brokerage transfer on death account (JPMorgan TOD). Milton named Linda as primary beneficiary on November 19, 2015.

---

[2] Milton was formally diagnosed with dementia and Alzheimer's disease in September 2015.

[3] Of the six assets listed, only one—the first—was never included in the Trust to begin with.

- Fidelity Brokerage transfer on death account (Fidelity TOD). Milton named Linda as the primary beneficiary on March 28, 2016.
- Vanguard Brokerage transfer on death account (Vanguard TOD). Milton named Linda as primary beneficiary on June 28, 2016.

Roth and Sanders were not made aware of these transfers. The total value of the Assets amounted to approximately $8 million, and these changes resulted in the Trust receiving approximately $200,000 instead of $8 million from the Assets. This change effectively resulted in David's disinheritance.

Milton died on November 22, 2016. Shortly after Milton's death, Roth and Sanders learned of the diversion of the Assets from the Trust to Linda.

On December 15, 2016, a meeting took place between Linda, Roth, Sanders, and David. At that meeting, Linda admitted to re-titling the Assets and admitted that Milton did not intend to disinherit David. Linda agreed to resign as co-trustee and replace all the Assets into the Trust in exchange for David's agreement to refrain from filing a lawsuit and to try to restore family harmony. She began performance within days by resigning as co-trustee and disclaiming her status as primary beneficiary of one account—the Vanguard TOD—resulting in David receiving the entire amount of that asset, totaling approximately $1.5 million. Linda took no further action on the remaining Assets.

### The Litigation

When it became apparent that Linda did not intend to return the rest of the Assets to the Trust, David filed a complaint. He filed a first amended

complaint on April 20, 2018. Linda filed a motion to dismiss. While that was pending, the trial court issued a case management order setting a discovery deadline and expert disclosure date of January 4, 2019, and a jury trial[4] start date of March 4, 2019. The trial court granted Linda's motion to dismiss for two of the three counts.

[8] David filed a second amended complaint on January 7, 2019.[5] His complaint includes the following relevant claims: undue influence, lack of testamentary capacity, breach of fiduciary duty, fraud and constructive fraud, conversion, and breach of contract. Linda filed a new motion to dismiss and motion for summary judgment on the second amended complaint. On February 19, 2019, the trial court denied the motions. Linda had argued, among other things, that the contract stemming from the December 2016 meeting—pursuant to which she had agreed to return the Assets to the Trust—must have been in writing to be enforced. The trial court disagreed, noting that because David alleged that "the parties also agreed to 'restore family harmony' in addition to staying out of court," the contract need not have been in writing. Appellant's App. Vol.

---

[4] Linda demanded a jury trial.

[5] Linda also filed a second amended cross-claim against Sanders as Trustee. Sanders filed a motion for summary judgment, which the trial court granted in part on February 21, 2019. The trial court later granted a directed verdict for Sanders on the remaining portion of the cross-claim. Linda has not appealed these orders.

XVIII p. 38.[6]  On February 28, 2019, Linda filed her answer and affirmative defenses.

[9]  Before the trial began, David filed a motion in limine seeking, among other things, to prohibit Linda from testifying about statements made by Milton.  In making this argument, David directed the trial court to the Dead Man's Statute.  Ind. Code ch. 34-45-2.  On February 28, 2019, the trial court granted the motion, holding that Linda "may not testify about what Dr. Bergal said or testify about actions that constitute an assertion by Dr. Bergal."  Appellant's App. Vol. XX p. 22.

[10]  On March 4, 2019, the trial court entered a pretrial order (PTO), which included Linda's affirmative defenses, and the jury trial began.  The next day, David filed a motion to strike the affirmative defenses.  The trial court granted the motion to dismiss with respect to seventeen of Linda's forty-five affirmative defenses on March 18, 2019, subsequently amending the PTO to that effect.  Appellant's App. Vol. XXI p. 18-19 (a chart attached to the trial court's order carefully and thoroughly goes through each of Linda's forty-five affirmative defenses).

---

[6] As part of this order, the trial court also held, in response to arguments made by Linda, that David was a real party in interest who was entitled to bring the complaint on behalf of the Trust.  While Linda quarrels with this holding, she does not raise the issue until her Reply Brief—which is too late.  Ind. Appellate Rule 46(C); *see also Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 593 n.6 (Ind. 2001) ("Because [the appellant] raised this issue for the first time in his reply brief, it is waived.").  Therefore, we will not consider this issue herein.

[11]     On March 21, 2019, David filed a motion in limine seeking to restrict the testimony of Dr. Mark Simaga, a physician who treated Milton; the trial court granted the motion the same day. The trial court ordered that Dr. Simaga was only permitted to testify "as to his opinions which relate to his period of treatment [of Milton] . . . , including treatment of his patient, his opinion on the mental status of [Milton], his diagnoses, the prognosis for the patient, and the patient's executive function," as well as to how Milton "appeared over the years from 2000 to 2014 or 2015, at their hospital board meetings." *Id.* at 44.

[12]     Following the fourteen-day jury trial, the jury received its final instructions. Linda objected to the instruction regarding fraud, and the trial court overruled the objection.

[13]     On March 22, 2019, the jury unanimously found in favor of David and against Linda on all of David's claims and Linda's counterclaims. On the verdict form, the jury was able to indicate which of the Assets should be restored to the Trust by virtue of each claim; as the Assets and claims were overlapping, many of the Assets fell under multiple claims. Specifically, each of the Assets was ordered to be restored to the Trust for the following reasons:

- Vanguard IRA: breach of contract.
- JPMorgan IRA: undue influence; breach of contract.
- Nicholas Fund: undue influence; Milton's lack of testamentary capacity; breach of fiduciary duty; fraud; constructive fraud; conversion.
- JPMorgan TOD: undue influence; Milton's lack of testamentary capacity; breach of contract.
- Fidelity TOD: undue influence; Milton's lack of testamentary capacity; breach of contract.

- Vanguard TOD: undue influence; Milton's lack of testamentary capacity; breach of contract.

Appellant's App. Vol. XXI p. 105-22.  The trial court entered an oral judgment in David's favor from the bench following the verdict.  Am. Tr. Vol. X p. 74.[7]

[14]  On April 25, 2019, the trial court entered a first amended judgment.  On May 22, 2019, the trial court entered a second amended judgment.[8]  The order largely recounts the jury's verdict.  It also explicitly notes the need, given the overlapping claims, to avoid duplicative recovery.  To that end, the trial court ordered as follows:

> Though the verdict directed recovery of certain accounts under multiple causes of action, each account shall only be delivered once to the Trust, subject to one recovery of the entirety of each account (including its income and gains).  This Court's hearing on Linda Bergal's accounting for all accounts she received as a result of Dr. Bergal's death will allow for an appropriate review of credit and/or recovery for disbursements made by Linda Bergal from Dr. Bergal's accounts, including required minimum distributions taken out of Dr. Bergal's IRA accounts.  Of further note, is that the Jury found in favor of [David] on the [Nicholas Fund] in the amount of $1,963,237.82 based on multiple theories . . . ; accordingly, that amount is awarded in favor of

---

[7] There were some court reporter issues with respect to the transcript in this case.  Eventually, a second amended transcript was filed.  But its pagination was wholly different from the pagination of the (first) amended transcript, which is what was used by the parties in writing their briefs.  To aid this Court in its review, we directed that the (first) amended transcript be filed in Odyssey, and that is the transcript version to which we cite herein.

[8] The trial court also entered a modified second amended judgment that is stamped May 22, 2019, but may not actually have been filed until August 20, 2019—after this appeal had commenced.  As such, we will frame our analysis herein around the second amended judgment.

[David] and on behalf of the Trust . . . , subject to one recovery. The issue of credits for gains and income for each account delivered to the Trust can be addressed by this Court in its review of the accounts delivered to the Trust and Linda Bergal's accounting with appropriate credit.

Appellant's App. Vol. XXI p. 150-51. Linda now appeals.

# Discussion and Decision

## I. Denial of Motion to Dismiss Breach of Contract Claim

Linda argues first that the trial court erred by denying her motion to dismiss the breach of contract claim. She contends that under these circumstances, the contract must be in writing.

We apply a de novo standard of review to a trial court's ruling on a motion to dismiss for the failure to state a claim pursuant to Indiana Trial Rule 12(B)(6). *Shi v. Yi*, 921 N.E.2d 31, 36 (Ind. Ct. App. 2010). The grant or denial of a motion to dismiss turns only on the legal sufficiency of a claim—that is, whether the allegations in the claim establish any set of circumstances under which a plaintiff would be entitled to relief. *Id.* at 37. The grant or denial of a motion to dismiss turns only on the legal sufficiency of the claim and does not require determinations of fact. *Id.* at 36-37.

Generally, oral agreements are enforceable. *Vernon v. Acton*, 732 N.E.2d 805, 809 (Ind. 2000). Linda contends that in this case, the general rule does not apply for two reasons: (1) Indiana Code chapter 30-4-7 required the agreement

to be in writing; and (2) the terms of the oral agreement were not sufficiently settled to be enforceable.

[18] Indiana Code chapter 30-4-7 applies, in relevant part, "to the compromise of a contest or controversy with respect to . . . [t]he administration of a trust." I.C. § 30-4-7-1(3). An agreement of compromise relating to the administration of a trust must be in writing. I.C. § 30-4-7-6.

[19] "Administration" is not defined in the statute and has not been construed by this Court. To "administer" is "to manage or supervise the execution, use, or conduct of." *Merriam-Webster Dictionary*, at https://www.merriam-webster.com/dictionary/administer (last visited July 10, 2020). Chapter 5 of the Indiana Trust Code is entitled, "Rules Governing the Administration of a Trust[.]" I.C. ch. 30-4-5. It references, among other things, the following:

- The trustee's duty to provide written statements of accounts;
- The trustee's ability to obtain a nonjudicial settlement of accounts; and
- The trustee's right to reasonable compensation.

I.C. §§ 30-4-5-12 through -21. These examples of the administration of a trust all relate to the trustee's managerial functions, which falls squarely under the general definition of "administer" quoted above.

[20] As a matter of policy, it makes great sense that the legislature imposed an in-writing requirement for settlements that go to the operation, dispersal, or management—the administration—of trusts, which must, themselves, be in writing. I.C. § 30-4-2-1.5. It follows that agreements that alter the terms of the

trust—by affecting the trust's construction or validity, the rights afforded to the beneficiaries, or the management of the trust's corpus and methods of distribution—should be in writing, too. But the legislature has decided (by omission) that the same is not true for agreements that do not impact the construction, operation, or management of a trust.

[21] What we must decide here is whether the agreement reached at the December 2016 meeting related to the administration of the Trust. Linda had engineered the reassignment of the Assets from the Trust to herself as primary beneficiary. At the meeting, she agreed, in exchange for David's promise not to file a lawsuit and to maintain peace in the family, to disclaim those Assets.

[22] Linda's portion of the agreement—disclaiming the Assets so that they could be returned to the Trust—did not relate to the administration of the Trust. It did not concern the management or supervision of the Trust, nor did it relate to how, when, or to whom assets were to be directed or disbursed, nor did it concern the manner in which assets were to be invested or safeguarded. Likewise, David's portion of the agreement—refraining from filing a lawsuit and working to maintain family harmony—did not relate to the management or supervision of the Trust or to anything else that could reasonably be considered to fall under trust administration.

[23] Linda argues, essentially, that because the agreement *relates* to a trust, it necessarily falls under Indiana Code chapter 30-4-7, which requires an agreement be in writing. But the General Assembly did not draft that chapter

so broadly. Instead, it limited the statute's reach to the *administration* of trusts. We agree with David that our legislature "could not have intended 'administration' to include the return of wrongly taken property back to the trust's corpus." David's Br. p. 17.

[24] The agreement here did not impact the Trust's construction, operation, or management. It neither changed nor enforced the terms of the Trust, nor did it alter Milton's intent regarding the supervision of the Trust's assets. Instead, it concerned property wrongly taken outside of the Trust, which Linda agreed to return. Therefore, the agreement need not have been in writing and the trial court did not err by denying the motion to dismiss on this basis.

[25] Next, Linda contends that even if the agreement need not have been in writing, its terms were not settled enough for it to be enforceable. What she is *actually* arguing here is that the evidence is insufficient to support the jury's conclusion that David proved that an agreement existed and that she breached the terms of that agreement. Our standard of review on a challenge to the sufficiency of the evidence supporting a jury verdict is the same in civil as in criminal cases. *Auto Liquidation Ctr., Inc. v. Chaca*, 47 N.E.3d 650, 654 (Ind. Ct. App. 2015). Thus, we consider only the evidence most favorable to the verdict and the reasonable inferences to be drawn therefrom. *Id.* We will neither reweigh the evidence nor assess witness credibility, and we will affirm unless we conclude that the verdict "is against the great weight of the evidence." *Id.*

Four people were present when the December 2016 agreement was formed—David, Roth, Sanders, and Linda. Roth, Sanders, and David each testified that the agreement existed:

- Roth: Linda "agree[d] to put everything back into the Trust[.]" Am. Tr. Vol. I p. 161. "Linda, David, [Sanders], and I agreed that assets would be placed back into Dr. Bergal's Trust." Am. Tr. Vol. II p. 6.
- Sanders: At the meeting, Linda said "Mr. Roth, I don't agree [with replacing the Assets in the Trust], but in order to maintain peace with David and the family I will do it. . . . Linda's point was that [she] want[ed] to maintain a relationship with David and the family." *Id.* at 184.
- Sanders: When the meeting was adjourned, it was "[my] understanding that there was an agreement between the parties to put back into the B Trust those assets that Dr. Bergal had originally intended to be [in the Trust.]" *Id.* at 187-88.
- David: At the meeting, Linda "said, [']Milton and I did some alterations to his estate, uh, but I want things to go back to the way it was in [the] 2009 Will and Trust.['] . . . [A]t which point I believe Mr. Roth said, [']Then there's no need for us. We're all in agreement then. We all agree.['] And then—and I said, Yes. And I said yes. Linda said yes. [Roth and Sanders] said yes. We all agreed. And [I] believe about this time [Roth] said, [']So there's no reason to pursue . . . litigation.['] And we all said there's no reason, no. No reason. . . . Linda's putting everything back in." Am. Tr. Vol. VII p. 30-31.

[27] Linda directs our attention to her own testimony, which runs counter to what the above witnesses stated. But it was for the jury to weigh the conflicting evidence and assess the credibility of the witnesses, and we will not second-guess its assessment. There is credible evidence in the record establishing that an agreement was reached—that Linda would put the Assets back in the Trust—in exchange for consideration—David's promises not to sue and to

maintain peace in the family. This evidence supports the jury's conclusion that an oral contract was made.

[28] That said, we must address the Vanguard IRA, which is unique among the Assets. The Trust was created in 2009, and the Vanguard IRA was never included.[9] In 2010, Milton made Linda the primary beneficiary of that asset—many years before anyone has suggested his mental capacity began to deteriorate. As noted above, all the evidence in the record supporting a conclusion that an oral contract was created shows that Linda agreed to "put everything back," "to replace," and to "put back into" the Trust the assets that had been removed. Am. Tr. Vol. I. p. 161; Vol. II p. 184, 187-88. As the Vanguard IRA was never in the Trust to begin with, these promises cannot have encompassed that account.

[29] Consequently, we can only find that the evidence supporting the jury's verdict on breach of contract with respect to the Vanguard IRA is insufficient. And as that claim is the only one related to the Vanguard IRA, the only possible outcome with respect to this asset is that Linda may retain it. Therefore, we reverse the judgment with respect to the Vanguard IRA.

---

[9] David claims that Milton's "estate plan contemplated that *all IRAs* would flow to the Trust," but does not offer a citation to the record in support of that assertion, nor can we find any such evidence. David's Br. p. 44 (emphasis in original).

# II. Evidentiary Issues

[30] Next, Linda argues about three evidentiary issues that arose before and during the trial: (1) the trial court erred by relying on the Dead Man's Statute in prohibiting her from testifying about statements made by Milton; (2) the trial court erred by striking some of her affirmative defenses; and (3) the trial court made erroneous rulings related to the parties' respective expert witnesses.

## A. Dead Man's Statute

[31] As noted above, before the trial began, David filed a motion in limine seeking, among other things, to prohibit Linda from testifying about statements made by Milton. In making this argument, David directed the trial court to the Dead Man's Statute. In relevant part, Indiana Code section 34-45-2-4 provides as follows:

> (a)    This section applies to suits or proceedings:
>
> > (1)    in which an executor or administrator is a party;
> >
> > (2)    involving matters that occurred during the lifetime of the decedent; and
> >
> > (3)    where a judgment or allowance may be made or rendered for or against the estate represented by the executor or administrator.
>
> \*\*\*
>
> (d)    . . . a person:

(1)      who is a necessary party to the issue or record; and

(2)      whose interest is adverse to the estate;

is not a competent witness as to matters against the estate.

The trial court granted David's motion, holding that while Linda was not "per se incompetent[, s]he may not testify about what Dr. Bergal said or testify about actions that constitute an assertion by Dr. Bergal." Appellant's App. Vol. XX p. 22. Linda argues that this order was erroneous.

[32]      The general purpose of the Dead Man's Statute "is to protect a decedent's estate from spurious claims." *Fisher v. Estate of Haley*, 695 N.E.2d 1022, 1026 (Ind. Ct. App. 1998) (interpreting prior version of statute that was virtually identical to current one). It is a rule "of fairness and mutuality requiring that, 'when the lips of one party to a transaction are closed by death, the lips of the surviving party are closed by law.'" *Id.* at 1026-27 (quoting *Johnson v. Estate of Rayburn*, 587 N.E.2d 182, 184 (Ind. Ct. App. 1992)). Rather than excluding evidence, the statute prevents a particular class of witnesses from testifying about claims against the estate. *Id.* at 1027. The statute does not render the surviving party incompetent for all purposes; instead, its application "'is limited to circumstances in which the decedent, if alive, could have refuted the testimony of the surviving party.'" *Id.* (quoting *Johnson*, 587 N.E.2d at 185).

[33]     Linda's primary argument is that the Dead Man's Statute does not apply to cases involving trusts because trusts are distinct from estates.[10] *Compare* Ind. Code tit. 29 (concerning estates) *with* Ind. Code tit. 30 (concerning trusts). She directs our attention to *Given v. Cappas*, 486 N.E.2d 583 (Ind. Ct. App. 1985), which considered the application of the Dead Man's Statute to litigation involving stock held by a trust:

> The General Assembly, in enacting the Dead Man's Statute for the protection of the assets of an estate and to prevent fraudulent claims did not intend for the statute to prevent testimony which could not in any way affect the estate assets. . . . It is uncontroverted that the stock at issue is held [in a trust]. It is not and never was an asset of [the decedent's] estate. The complaint in the instant case requests the court to declare that the stock is held for the plaintiffs and to direct that the stock be conveyed to the plaintiffs. The stock is held and necessarily would be conveyed by [the trustee] in her capacity as trustee. The judgment that could have been and was, in fact, rendered was against the trust, not the estate of [the decedent]. If the assets of the estate can not be affected, the Dead Man's Statute has no application and witnesses may not be rendered incompetent on that basis.

*Id.* at 588 (internal citation omitted), *abrogated on other grounds by Wilbur v. KeyBank Nat'l Assoc.*, 962 F. Supp. 1122 (N.D. Ind. 1997); *see also In re Knepper*,

---

[10] To the extent that Linda also argues that there is no executor or administrator who is a party to this litigation, we note that this Court has held that even if an administrator or executor is not a party to the action, the Dead Man's Statute applies where one of the parties is acting in the capacity of an administrator or executor. *In re Unsupervised Estate of Harris*, 876 N.E.2d 1132, 1135 (Ind. Ct. App. 2007). We have little difficulty concluding that Sanders, who is the trustee of the Trust, which included the bulk of Milton's estate, is acting in the capacity of an administrator or executor.

856 N.E.2d 150, 156 (Ind. Ct. App. 2006) (holding that the Dead Man's Statute did not apply to non-probate payable on death account because "[n]o estate was ever opened . . . and [the guardian of the decedent] was never an executor or administrator of such an estate" so "the Dead Man's Statute—on its face—does not apply here").

[34] On the other hand, we also have *Reddick v. Keesling*, which, while centuries old, is still standing precedent from our Supreme Court. 28 N.E. 316, 129 Ind. 128 (1891). In *Reddick*, our Supreme Court considered the application of the Dead Man's Statute[11] to a dispute regarding trust assets. The *Reddick* Court rejected a husband's attempt to testify "to matters that occurred between him and his wife . . . prior to the time of her death" about the proper disbursement of trust assets. *Id.* at 318-19. Our Supreme Court reasoned that because the wife's mouth "was closed by death, we think the law closed the mouth of the [husband]." *Id.* at 319. And more recently, while assessing whether a party had waived the right to invoke the Dead Man's Statute, our Supreme Court did not object to the statute applying in a case involving non-probate transfers. *In re Estate of Rickert*, 934 N.E.2d 726, 731-32 (Ind. 2010).[12]

---

[11] Obviously, *Reddick* considered a prior version of the Dead Man's Statute. But there are no material differences relevant to this case between the version in place in 1891 and the version in place today.

[12] Clearly, given the case name, *Rickert* was a case in which an estate had been opened. But the relevant issue concerned whether the Non-Probate Transfer Act is implicated in the context of transfer on death accounts and joint accounts. *Id.* at 729.

[35]     In this case, the evidence in the record shows that the Trust was the primary piece of Dr. Bergal's overall estate plan. Specifically, the will that was created at the same time as the Trust was "a pour over Will, which said that if Dr. Bergal owned anything in his name it would pour over into the Trust so that everything would be in the Trust ultimately at the time of his death." Am. Tr. Vol. I p. 115. As part of the overall estate plan, Milton intended that all his assets—including the Assets—should be placed in the Trust. Therefore, while the Trust itself is non-probate, we are convinced that it is sufficiently related to probate that the outcome of this case will affect his overall estate. *Cf. Fulp v. Gilliland*, 998 N.E.2d 204, 205 (Ind. 2013) (observing that "[r]evocable trusts are popular substitutes for wills, intended to provide non-probate distribution of people's estates after their death, allowing them to retain control and use of their assets during their lifetimes").[13], [14]

[36]     In sum, we find that in this particular case, the Trust at issue is so central to Milton's overall estate plan that it is akin to the estate itself. Under these circumstances, we find that the trial court did not err by finding that the Dead

---

[13] Linda argues that she was subjected to unfair surprise because the trial court had ruled earlier in the case that the Dead Man's Statute did not apply. But trial courts are free to "reconsider, vacate, or modify any previous order" until the entry of final judgment. *P.R. Mallory & Co. v. Am. Cas. Co. of Reading, Pa.*, 920 N.E.2d 736, 747 (Ind. Ct. App. 2010) (internal quotation marks omitted). Therefore, we find no error in this regard. Likewise, whether or not Linda's testimony would be admissible under an exception to the rule against hearsay has no bearing on our resolution of this issue.

[14] Linda also argues that David opened the door to her testimony by calling her to testify and asking her questions about the asset transfers. We disagree, as the questions focused on Linda's actions rather than on what Milton said about them. Therefore, we decline to find error on this basis.

Man's Statute prevented Linda from testifying about statements made by Milton.

## B. Affirmative Defenses

[37] Next, Linda argues that the trial court erred by granting David's motion to strike some of her affirmative defenses, thereby modifying the PTO. She contends that the trial court erred by concluding that she had untimely filed her affirmative defenses and by modifying the PTO in the middle of trial.

[38] Pretrial orders are intended to "limit the issues for trial to those not disposed of by admissions or agreement of counsel, and such order when entered shall control the subsequent course of action, unless modified thereafter to prevent manifest injustice." Ind. Trial Rule 16(J). In deciding whether to modify a pretrial order, the trial court must consider "'both the danger of surprise or prejudice to the opponent, and the goal of doing justice to the merits of the claim.'" *Chacon v. Jones-Schilds*, 904 N.E.2d 286, 289 (Ind. Ct. App. 2009) (quoting *Daugherty v. Robinson Farms, Inc.*, 858 N.E.2d 192, 198 (Ind. Ct. App. 2006)).

[39] In considering timeliness of the affirmative defenses, we must go back closer to the beginning of the litigation. David filed his original complaint in February 2017; Linda filed an answer and eleven affirmative defenses. David filed his first amended complaint in April 2018; the trial court granted Linda's motion to dismiss the first two counts of that complaint but gave David a roadmap for refiling. Linda filed an answer to the remaining count plus thirty affirmative

defenses. On January 7, 2019, David filed his second amended complaint; Linda filed an answer plus forty-five affirmative defenses (seventeen of which were filed for the first time) on February 28, 2019, just a few days before the trial was scheduled to begin. Partway through the trial, the trial court partially granted David's motion to strike Linda's affirmative defenses. Specifically, it struck the seventeen affirmative defenses that had not been filed with her answer to his first amended complaint. Appellant's App. Vol. XXI p. 16-19.

[40] Linda argues that she should have been permitted to raise new affirmative defenses because David's second amended complaint included significant changes and additions that warranted newly-raised affirmative defenses. We disagree. David's first complaint included two counts against Linda—one demanding that Linda return the Assets based loosely on breach of fiduciary obligations, undue influence, testamentary capacity, and fraud; and a second requesting an accounting from Sanders. Linda filed an answer and affirmative defenses related to both counts.

[41] David's first amended complaint added a third count—breach of contract. The trial court dismissed two counts of the first amended complaint but provided him with a roadmap to refile; the new breach of contract claim survived. Linda filed an answer and affirmative defenses regarding the breach of contract claim.

[42] When David filed his second amended complaint, it followed the trial court's roadmap and did not add anything substantive that would justify a whole host of new affirmative defenses that had never before been raised.[15]

[43] The trial court observed that "[y]ou know, and I note that [David's] latest complaint did not really change much from the prior [complaint], in terms of what the Court had ruled. But it sure brought out a plethora of defenses . . . ." Am. Tr. Vol. VI p. 141. The trial court also noted that many of Linda's affirmative defenses were actually counterclaims that the trial court had struck, which she was trying to revive as affirmative defenses. It is apparent, from reviewing the transcript, that the trial court was frustrated with the way in which Linda had litigated the case, which involved a great deal of delay and obfuscation and little in the way of attempts to present and prove her case. We decline to second-guess the trial court's ruling on this issue, as it is evident that the trial court carefully considered each affirmative defense and made a separate ruling on each one. We also note that the trial court allowed Linda to retain all the affirmative defenses that she had pleaded in response to David's original and first amended complaints.

[44] In striking Linda's affirmative defenses, which had originally been included in the PTO, the trial court modified the PTO. Given the trial court's conclusions

---

[15] While the second amended complaint did add a number of paragraphs about how David was a real party in interest, it was implicit from the outset that this was his position. Moreover, whether or not he was a real party in interest is an issue of law that Linda raised—and lost—when she moved to dismiss the second amended complaint. Appellant's App. Vol. XVI p. 102-13.

that the problematic affirmative defenses had been untimely filed and that some of them were ill-advised attempts to make an end-run around the trial court's order striking Linda's counterclaims, it is apparent that the trial court found that modifying the PTO was necessary to prevent a manifest injustice. We decline to find error with respect to the trial court's decision in this regard.

## C. Witness Rulings

[45] Next, Linda argues that the trial court erred in the way it handled one of her witnesses and one of David's expert witnesses. A ruling regarding the admissibility of expert testimony is within the trial court's broad discretion. *McDaniel v. Robertson*, 83 N.E.3d 765, 772 (Ind. Ct. App. 2017). We presume that the trial court's decision is correct, and the burden is on the challenging party to persuade us that the trial court erred. *Id.* at 773.

## 1. Dr. Simaga

[46] One of Linda's witnesses was Dr. Mark Simaga, a physician who treated Milton. Linda did not designate Dr. Simaga as an expert witness, instead designating him as a fact witness with personal knowledge about Milton. Appellant's App. Vol. XVIII p. 69-70.

[47] After David filed a motion in limine seeking to limit Dr. Simaga's testimony, the trial court granted it in part, allowing Dr. Simaga to "testify as to his opinions which relate to his period of treatment . . . including treatment of his patient, his opinion on the mental status of [Milton], his diagnoses, the prognosis for the patient, and the patient's executive function." Appellant's

App. Vol. XXI p. 44. Dr. Simaga was also permitted to testify regarding how Milton "appeared over the years from 2000 to 2014 or 2015, at their hospital board meetings." *Id.*

[48] Dr. Simaga was not permitted to present general expert testimony not based on his treatment of Milton—because he had not been designated as an expert witness. We find no error in this regard.

## 2. Dr. Shaw

[49] One of David's expert witnesses was Dr. Geoffrey Shaw.[16] Linda directs our attention to the following portions of Dr. Shaw's report, which was admitted into evidence:

- "It is my opinion that Dr. Bergal engaged in these financial transactions due to undue influence from his wife." Appellant's App. Vol. XXIV p. 12.
- "The financial transactions that were made in 2015-2016 were executed while [Milton] suffered from Dementia and physical frailty and were unduly influenced by his wife . . . ." *Id.* at 13.
- During the relevant period of time, Milton "lacked the capacity" to make decisions, engage in financial transactions, and understand his actions and their consequences. *Id.*

Linda argues that these statements amounted to legal conclusions that are not admissible. Ind. R. Evid. 704(b). When Linda objected to these portions of the

---

[16] It appears, though it is not wholly clear, that Linda argues that the trial court erred by giving David an extension of time to produce Dr. Shaw's final, written expert report. She does not, however, make any cogent argument or cite to authority in support of this argument. Consequently, we decline to address it.

report at trial, she focused primarily on the phrase "unduly influenced[.]" Am. Tr. Vol. V p. 36-37. The trial court struck the word "unduly[.]" *Id.* at 37. As Linda did not make more thorough arguments to the trial court or direct its attention to other specific words or phrases, we decline to reverse on this basis.[17,18]

[50] Next, Linda notes that in reaching his conclusions, Dr. Shaw relied on findings from other physicians, a therapist, and a social worker. Although Linda argues that this amounted to reliance on inadmissible hearsay, we note that Indiana Rule of Evidence 703 allows experts to "testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field." More specifically, our Supreme Court has held that "information which aided in the formation of the [expert's] opinion, though hearsay in nature and though not falling within any hearsay exception, may nevertheless be admissible." *Miller v. State*, 575 N.E.2d 272, 274 (Ind. 1991). Therefore, we find no error on this basis.

---

[17] Linda also argues that the trial court failed to properly redact Dr. Shaw's report, which identified his opinion as an "independent medical opinion[.]" Appellant's App. Vol. XXIV p. 2. The word "independent" was redacted with a piece of tape, and after photocopying the document, the word was still somewhat visible. But she did not make this argument to the trial court and has consequently waived it; furthermore, we find that any error in this regard was harmless, given that there is no evidence that the jury could see through the taped copy and the trial court did not highlight the redactions.

[18] We also note that when Dr. Shaw testified during the trial, he did not testify about undue influence, instead focusing on Milton's susceptibility resulting from his diagnoses.

# III.  Jury Issues

Next, Linda raises several issues related to the jury: she argues that (1) the trial court gave erroneous jury instructions; (2) the verdict forms were improper; and (3) the jury fashioned an equitable remedy, which is impermissible.

# A.  Instructions

First, with respect to the jury instructions, we must consider whether the challenged instructions (1) correctly state the law; (2) are supported by evidence in the record; and (3) are covered in substance by other instructions. *Wal-Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 893 (Ind. 2002).

Linda focuses her argument on Jury Instruction Number 11, which instructed the jury on fraud.[19]  The instruction reads as follows:

> Fraud is an act, course of action, omission, or concealment by which a person cheats or deceives another person.
>
> "Omission" means leaving out.
>
> "Concealment" means hiding.
>
> To recover damages for fraud, David Bergal must prove by the greater weight of the evidence that:

[19] Linda later gives a broad, vague summary of her objections to Instructions 8, 9, 12, and 13, stating that "due to word constraints" she was "unable to maintain strict compliance with Indiana Appellate Rule 46(A)(8)(e)[.]"  Appellant's Br. p. 51.  It is for parties to evaluate their arguments and decide how to allocate their space in appellate briefs.  Linda decided not to offer specific arguments related to these instructions—she also failed to cite any authority related to these arguments—and we decline to articulate and analyze arguments on her behalf.  We are unable to address the vague and general arguments related to these other instructions.

(1)     Linda Bergal made false statements of important past or existing fact;

(2)     Linda Bergal knew the statements were false, or made them recklessly without knowing whether they were true or false;

(3)     Linda Bergal made the statements to cause action upon them;

(4)     The actor justifiably or reasonably relied and acted upon the statements; and

(5)     David Bergal as trustee was damaged as a result.

David Bergal must prove his claim by the greater weight of the evidence.

Appellant's App. Vol. XXI p. 86.

[54]     Linda complains, among other things, that the instruction labels David as "trustee"[20] and that the instruction led the jury to believe that fraud could be found if Linda merely caused harm to David.[21]  Even if this instruction were erroneous, it would be harmless.  The only Asset that the jury ordered to be recovered pursuant to the fraud count was the Nicholas Fund.  But the jury also ordered that Asset to be recovered pursuant to the claims for undue influence, testamentary capacity, breach of fiduciary duty, constructive fraud, and

---

[20] While David is not a trustee of the Trust, he *is* the trustee of Trust B.  Therefore, while imprecise, the language in the instruction is not per se incorrect.

[21] We note that Linda did not make either of these specific arguments below; instead, she made a general argument that the instruction was confusing and misstated the law, without explaining the specific reasons she believed it to be so.

conversion. Consequently, even if the fraud instruction contained erroneous language, it would not affect the jury's ultimate determination with respect to the Nicholas Fund. Linda is not entitled to relief on this basis.

## B. Verdict Forms

[55] Next, Linda contends that the trial court gave the jury special verdict forms, which have been abolished. Ind. Trial Rule 49; *see also Tincher v. Davidson*, 762 N.E.2d 1221, 1225 (Ind. 2002) (observing that the adoption of Trial Rule 49 was intended to "curtail[] the practice of asking juries to disclose the basis for their verdicts"). A "special verdict" is one "that gives a written finding for each issue, leaving the application of the law to the judge." *Black's Law Dictionary* 1555 (7th ed. 1999).

[56] Linda conclusorily argues that the jury in this case was presented with a "Special Interrogatory Verdict Form." Appellant's Br. p. 53. She does not explain why the verdict form qualifies as such, nor does she cite to specific portions of the forms as evidence of her contention.

[57] The forms were entitled "Verdict Form." Appellant's App. Vol. III p. 34-55. And the forms simply offered the jury a yes-no selection on (1) liability and (2) which accounts required return based on the liability finding. The forms did not ask the jury to provide factual findings, answer questions about the decision-making process, or give their element-by-element analysis on the claims.

[58]     It is not entirely clear, but the crux of Linda's argument on this issue appears to focus on the fact that, for each claim and theory of liability, the jury had to select which accounts were required to be restored. In the context of this case, that was essentially the only practical way to proceed. David brought overlapping claims, seeking both the restoration of particular accounts under multiple theories and the return of multiple accounts under particular theories. For example, David argued that Linda committed six different torts with respect to the Nicholas Fund account; he also argued that her repeated instances of undue influence resulted in the improper transfer of five separate accounts on five separate dates. The question for the jury, then, was which accounts required return under which theories. Under these circumstances, the verdict form used by the trial court was sensible and appropriate.

## C.  Remedy

[59]     Next, Linda argues that the "jury verdict returned was an equitable remedy, in direct contradiction of Indiana Trial Rules and Indiana caselaw." Appellant's Br. p. 54. As a general matter, a jury trial is not permissible when the claim is a cause founded in equity. *Stacey-Rand, Inc. v. J.J. Holman, Inc.*, 527 N.E.2d 726, 728 (Ind. Ct. App. 1988). According to Linda, because the jury "did not award the Trust (or David) actual damages (a legal remedy)," but instead ordered the trust corpus to be restored, the relief was equitable rather than legal. Appellant's Br. p. 55.

[60] Initially, we note that Linda knew all along that David's claims sought the return of the Assets to the Trust. Yet she did not assert that those claims were equitable and could not be submitted to a jury. Instead, she demanded a jury trial. She did not complain that the case could not be submitted to a jury until after the jury returned a verdict against her. Therefore, if there was any error, it was invited, and she has waived the argument by failing to raise it until after the verdict was returned.

[61] And on the merits of the argument, we note briefly that the relief sought by David was the return of misappropriated money and compensatory damages to make up for whatever Linda has dissipated. The latter is unquestionably legal in nature. The former—the return of wrongly taken money—has been treated by courts as a relief sounding in law, rather than equity. *Gates v. City of Indianapolis*, 991 N.E.2d 592, 593 (Ind. Ct. App. 2013) (holding that replevin suits are legal in nature). Consequently, this argument is unavailing.

# IV. Double Recovery

[62] Finally, Linda contends that the jury verdict resulted in a double recovery. As Linda acknowledges, "[n]o actual/monetary damage was assessed against Linda by the jury." Appellant's Br. p. 57. Instead, as noted above, the jury considered each theory of liability and determined which of the Assets was covered by that theory:

- Vanguard IRA: breach of contract.
- JPMorgan IRA: undue influence; breach of contract.

- Nicholas Fund: undue influence; Milton's lack of testamentary capacity; breach of fiduciary duty; fraud; constructive fraud; conversion.
- JPMorgan TOD: undue influence; Milton's lack of testamentary capacity; breach of contract.
- Fidelity TOD: undue influence; Milton's lack of testamentary capacity; breach of contract.
- Vanguard TOD: undue influence; Milton's lack of testamentary capacity; breach of contract.

Appellant's App. Vol. XXI p. 105-122. Obviously, if, for example, David actually recovered six times the amount represented by the Nicholas Fund because it fell under six different theories of liability, there would be a substantial problem. But that is not what happened.

[63] Instead, in the second amended judgment, the trial court explicitly notes the need, given the overlapping claims, to avoid duplicative recovery. To that end, the trial court ordered as follows:

> Though the verdict directed recovery of certain accounts under multiple causes of action, *each account shall only be delivered once to the Trust*, subject to one recovery of the entirety of each account (including its income and gains). This Court's hearing on Linda Bergal's accounting for all accounts she received as a result of Dr. Bergal's death will allow for an appropriate review of credit and/or recovery for disbursements made by Linda Bergal from Dr. Bergal's accounts, including required minimum distributions taken out of Dr. Bergal's IRA accounts. Of further note, is that the Jury found in favor of [David] on the [Nicholas Fund] in the amount of $1,963,237.82 based on multiple theories . . . ; accordingly, that amount is awarded in favor of [David] and on behalf of the Trust . . . , *subject to one recovery*. The issue of credits for gains and income for each account delivered to the Trust can be addressed by this Court in its review of the accounts delivered

> to the Trust and Linda Bergal's accounting with appropriate
> credit.

Appellant's App. Vol. XXI p. 150-51 (emphases added).  In other words, the
trial court reserved the issue of the actual amount of damages—which would
include each Asset only once—to be determined following an accounting and a
hearing.  It is not at all uncommon to bifurcate the issue of liability from the
issue of damages, and we see no problem with the trial court's decision to
handle this case in that way.  Indeed, it seems entirely prudent given the fact
that the accounting had not yet been made at the time the jury considered
liability; therefore, neither the amount that needed to be restored to the Trust
nor the amount, if any, that Linda will have to pay out of pocket could have
been determined at that time.

[64]  In reviewing the verdict forms and the trial court's orders, it is apparent that
David is correct that there is no risk of duplicative or excessive recovery:  "the
recovery under the judgment is explicit: each subject account, regardless of how
many of theories of liability under which it must be returned to the Trust, will
(and can) be returned only once, and [Linda] is personally liable for making
those accounts whole (plus interest and costs) to the extent she depleted them in
amounts lower than the respective dates on which she diverted them."  David's
Br. p. 42.

[65]  On the verdict forms, the trial court had written in an approximate amount
contained in each account.  That decision led to some confusion, which the trial
court seemed to realize.  Therefore, it was later made clear in an amended order

that the actual amount owed by Linda would be determined following an accounting and a damages hearing. Under these circumstances, we find no reversible error on this basis.[22]

[66] To the extent that Linda argues that the jury verdict is excessive, we can only find that this argument is premature. The trial court has reserved adjudication of the specific recoverable amounts for the hearing on Linda's accounting; that hearing has been stayed pending this appeal. We cannot consider whether any error has occurred because the trial court has not yet exercised its discretion in ruling on Linda's arguments regarding the amounts owed.[23]

[67] Linda filed a motion for guidance with this Court, which we granted in part with respect to the transcript. She also asked that she be reimbursed for the fee she paid the court reporter for the transcript preparation. We remand this issue to the trial court, to be considered as part of the further proceedings below.

[68] The judgment of the trial court is affirmed in part, reversed in part with respect to the Vanguard IRA, and remanded for further proceedings.

May, J., and Vaidik, J., concur.

---

[22] Linda briefly argues that the evidence does not support the jury's award regarding the Nicholas Fund based on testamentary capacity. Even if that were true, given the fact that the jury found that this asset needs to be returned to the Trust under multiple theories of liability, whether or not there is evidence supporting this particular finding is of no consequence to the ultimate resolution.

[23] To the extent that Linda points out that she has already disclaimed the Vanguard TOD account, we note that this is for the trial court to evaluate following her accounting. Obviously, if she has already disclaimed this account and if it is now owned by David, Linda need take no further action regarding this Asset.